SHORTESS, Judge.
George Noe (Noe) aggravated a congenital back condition while working on the M/Y PELICAN, a shell dredge owned by Radcliff Materials, Inc. (Radcliff), off the coast of Louisiana in the Atchafalaya Bay. Noe brought suit against Radcliff and the PELICAN, in rem, (defendants) under the Jones Act, 46 U.S.C. § 688, and general maritime law for damages for personal injury and for maintenance and cure. His wife, Peggy Lambert Noe, sought damages for loss of consortium. The suit was filed in the Sixteenth Judicial District Court, Parish of St. Mary, under Article III, Section 2, of the United States Constitution, the “saving to suitors” clause.
Both plaintiffs and defendants moved for a directed verdict at the close of all the evidence, but the trial court reserved ruling until after the jury verdict. The jury found that plaintiff injured his back while working on the PELICAN and awarded maintenance and cure of $35.00 per day for an unspecified time period until maximum cure was reached. The jury found that neither Noe nor defendants were negligent, that the vessel was not unseaworthy, and that the sum of $20,000.00 would adequately compensate Noe for the damages he sustained. The jury rejected Mrs. Noe’s claim for loss of consortium. Without expressly ruling on the motions for directed verdict, the trial court entered judgment in favor of Noe on the maintenance and cure claim and dismissed all other claims of plaintiffs. Noe moved for a hew trial, which motion was denied by the trial court. Noe then appealed to this court.[1] The defendants did not appeal the maintenance and cure award to Noe.
FACTS
The PELICAN was built approximately thirty years ago. It has four wing tanks on each side which provide flotation for the vessel. Water enters the tanks through “pin holes” in the deck area where the iron has worn or rusted away. Water is pumped from the tanks on a regular basis using portable jaeger pumps. A small hole was cut through the wall of the engine room into each wing tank to facilitate placement of the pumps’ suction hoses. These holes allowed more water to enter the tanks when the seas were rough. Captain Albert Veillon has worked on the vessel since it was built. He testified that jaeger pumps were used on the PELICAN *71 to pump the wing tanks even when it was new.
On April 1, 1983, the engines on the PELICAN were shut down because of bad weather; only the generator was running. On April 2, Noe, who worked aboard the PELICAN as an oiler, was left alone in charge of the engine room. His primary responsibility was to keep an eye on a jaeger pump which had been set up earlier by two other crewmen. Noe could call for help if needed by using a telephone which connected the engine room with the lever room.
Noe testified that he noticed no water was coming out of the discharge hose; that he discovered the suction hose was not in the water; that he pulled on the hose to position it in the water; that he again pulled on the hose to make sure it was at the bottom of the tank and in the water; and that he noticed a stinging or burning sensation in his back when he finished rearranging the hose.
On April 2 Noe reported to Billy Wilson, the relief captain, that his back hurt. Wilson testified, however, that Noe told him he did not know how he had injured his back. Wilson stated on the accident report filled out on April 3, “George Noe is complaining with his back and don’t remember how he hurt it.”
Noe continued to work his regular shift until Captain Veillon asked him to perform a task using a sledge hammer two days later. When he told the captain he had injured his back, he was assigned to work light duty until April 5, when he left the vessel and went home. That evening Noe was treated at Franklin Foundation Hospital by a Dr. True, family practitioner, who diagnosed his condition as a back muscle sprain. Dr. True gave Noe a note stating that he should work only light duty for three weeks. Noe did not return to work on the PELICAN, however. He sought no further medical treatment until May 6, 1983, when he was seen by Dr. Louis Blan-da, Jr., an orthopedic surgeon who, after numerous tests, found two congenital defects in Noe’s lower back.
JONES ACT DIRECTED VERDICT
Noe contends the trial court erred in failing to grant his motion for directed verdict. Louisiana courts must apply a federal standard of appellate review to Jones Act claims. Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La.1986); Trahan v. Gulf Crews, Inc., 260 La. 29, 255 So.2d 63 (1971). Although the plaintiff may prevail in a Jones Act case if he shows only slight negligence of the defendant, a directed verdict in favor of the plaintiff should not be granted if there is only slight evidence in his favor. The plaintiff should prevail on a motion for directed verdict only if, after considering all evidentiary inferences in the light most favorable to the defendant, the facts and inferences point so strongly in plaintiff’s favor that the court believes reasonable jurors could not arrive at a contrary verdict.[2] Springborn v. American Commercial Barge Lines, 767 F.2d 89, 99-100 (5th Cir.1985). This strict standard reflects the general policy that trial judges should rarely take issues away from juries or upset their verdicts. However, a judge’s decision to grant a directed verdict is not a matter of discretion but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury. In re Letterman Brothers Energy Securities Litigation, 799 F.2d 967 (5th Cir.1986).
In order to grant Noe’s motion for directed verdict under the Jones Act, the court must find that there was insufficient evidence to create a jury question on the following: (1) that Noe was injured while pumping the wing tanks on the PELICAN; (2) that there was slight negligence on the part of the defendants; and (3) that defendants’ negligence was a slight or “producing *72 cause” of Noe’s injury.[3] Defendants strongly contested Noe’s assertion that he was injured while pumping the tanks. The testimony of Wilson that Noe stated he did not know how he injured his back created a fact question for the jury which precluded the granting of a directed verdict. Furthermore, considering all evidentiary inferences in favor of defendants, there was sufficient evidence to create a jury question as to whether or not defendants were negligent in failing to repair the holes which allowed water to invade the wing tanks. Thus, Noe’s motion for directed verdict on his Jones Act claim was properly denied.
THE UNSEAWORTHINESS CLAIM
Noe further contends that there was no reasonable evidentiary basis to support a verdict that the PELICAN was seaworthy. In Daigle v. Coastal Marine, Inc., 488 So.2d at 681, n. 3, the Louisiana Supreme Court held that the Louisiana standard of appellate review applies to cases under general maritime law, which includes unseaworthiness cases. Thus, this court has authority under Article V, § 10(B), of the Louisiana Constitution to review both the law and the facts of this case and to reverse the jury’s verdict if it finds it to be clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Unlike the federal appellate courts which have limited review of fact, a Louisiana appellate court which concludes the jury’s factual findings are clearly wrong is not required to affirm simply because there is “some record evidence ... which would furnish a reasonable factual basis for the contested findings.” Mart v. Hill, 505 So.2d 1120 at 1127 (La.1987).
A vessel must be reasonably fit for her intended use, including normal weather conditions within a given area. The shipowner’s duty to furnish a seaworthy vessel is a type of liability without fault, to be considered separately from his Jones Act duty of reasonable care. Liner v. J.B. Talley & Co., 618 F.2d 327 (5th Cir.1980); Puamier v. Barge BT 1793, 395 F.Supp. 1019 (D.C.Ya.1974). The standard of causation in an unseaworthiness action is “proximate cause in the traditional sense.” Proximate cause means “(1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.” Smith v. Trans-World Drilling Co., 772 F.2d 157, 162 (5th Cir.1985).
Defendants do not contest on appeal the jury’s finding that Noe was injured while pumping water from a wing tank. They assert, however, that the holes in the wing tank did not render the vessel unseaworthy and that even if they did, the holes were not the proximate cause of Noe’s injury.
All of defendant’s witnesses admitted that the deck was rusted through in places, causing water to accumulate in the wing tanks. Alvin Marks, plaintiff’s expert in marine safety, testified that wing tanks are normally airtight and watertight, and that leaks in the tanks cause a considerable loss of flotation. Defendants provided no evidence to the contrary but relied on the testimony of Captain Veillon that jaeger pumps had always been used aboard the vessel to pump out the wing tanks. The fact that the wing tanks on the PELICAN were never properly airtight and watertight, however, does not render the vessel seaworthy. As the court stated in Sams v. Haines, 299 F.Supp. 746, 749 (D.C.Ga. 1969), “custom does not make seaworthiness.”
The pin holes in the deck allowed water to enter the wing tanks in fair weather, and the holes cut through the engine room walls allowed even more water to enter the wing tanks in rough seas. These holes cause a loss of flotation and rendered the vessel unfit for its intended use. Thus, we conclude that the jury was clearly wrong in finding that the PELICAN was seaworthy.
*73 Although the jury did not reach this question, we further conclude that the un-seaworthy condition of the vessel proximately caused Noe’s injury. The defects in the vessel allowed water to invade the wing tanks and required seamen to operate jae-ger pumps to empty them. This unseawor-thy condition played a substantial part in bringing about Noe’s injury, and his injury was a direct result of his use of a jaeger pump to empty the wing tank.
QUANTUM
When all of the facts are before the appellate court, it has constitutional authority to render judgment. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). Thus, having determined that the PELICAN was un-seaworthy and that Noe is entitled to judgment in his favor, we must determine the appropriate amount which will compensate him for his injuries.
Noe was seen in the emergency room of Franklin Foundation Hospital on April 5, 1983, by Dr. True, who diagnosed back muscle sprain. A month later he was seen by Dr. Blanda, who performed numerous tests, including x-rays, a CAT scan, a myelogram, and a diskogram. He concluded, based on these tests, that Noe had no lumbar disk injury. Dr. Blanda did find two congenital defects in Noe’s back: spon-dylolysis, and a transitional vertebrae with a pseudoarthrosis or false joint on the left side. Noe continued to complain of back pain after conservative treatment, and in July, 1984, Dr. Blanda recommended exploration and fusion of the congenitally defective area. However, Noe failed to return to Dr. Blanda’s office, until December 10, 1984, only a week before the trial, which Dr. Blanda found a “bit surprising” in view of Noe’s complaints of pain. We find that an award of $15,000.00 will adequately compensate Noe for pain and suffering.
Noe failed to submit any evidence of his medical expenses other than Dr. Blanda’s outstanding bill of $1,010.00. Dr. Blanda testified that if Noe had the recommended back surgery, the cost would be approximately $10,000.00. If and when Noe undergoes this surgery, he has the right under the open-ended judgment fashioned by the trial court to payment of those medical expenses by defendants as maintenance and cure. Lirette v. K & B Boat Rentals, 579 F.2d 968 (5th Cir.1978).
Noe also seeks damages for lost wages and future loss of wages, contending he is totally and permanently disabled. Noe was injured a few days before his forty-first birthday. At the time of trial he had a work life expectancy of 18 years. He has an eleventh grade education and has worked as a carpenter most of his life.
At the time of the accident Noe was working 14 days on, 7 days off, working 84 hours per week, earning $3.99 per hour for the first 40 hours and $5.99 per hour for the last 44 hours. Based on that salary, Seymour Goodman, Noe’s expert economist, testified Noe had lost wages up to the time of trial of $22,321.00. To this figure Goodman added $7,072.00 for the value of the meals Noe ate on the vessel, based on an expired union contract to pay seamen $17.00 per day for meals while in port, for a total of $29,393.00. Goodman further testified that Noe would have a discounted loss of future wages of $324,899.00, which includes loss of meals on the vessel valued at $53,544.00.
Goodman was unaware, however, that Noe had worked in late May or early June, 1983, as a carpenter for 2½ weeks earning $8.00 per hour. That employment ended because the construction job was complete. Noe testified he had not looked for work since then; he was just waiting to see the results of his lawsuit.
Furthermore, the testimony of Dr. Blan-da does not support an award based on total and permanent disability. Dr. Blanda testified that Noe should not do heavy manual labor, heavy lifting or bending, or driving for long distances, and that after surgery he would have a 15% disability. However, according to Dr. Blanda, Noe is capable of performing work of a lighter nature.
If Noe had secured a job earning only minimum wages of $3.35 per hour from the date of the accident until trial, he would have earned approximately $11,800.00, and *74 thus would have lost wages of approximately $10,500.00, exclusive of the value of meals, which we feel was not adequately proven. Thus, we find that the sum of $7,000.00 would adequately compensate Noe for his lost wages and any unpaid medical expenses from the time of his injury until trial. We further find that an award of $40,000.00 is appropriate to compensate Noe for the impairment of his future earning capacity. This award comports with Dr. Blanda’s opinion of residual disability after surgery and plaintiffs refusal to even look for work while his litigation was pending.
THE AMBIGUOUS VERDICT
The jury verdict included the question: “What amount (without reduction on account of any contributory negligence you might find on the part of George Noe) will fairly and adequately compensate George Noe for the damages he sustained?” The jury answered, “$20,000.00” despite the fact that it found no negligence of defendants or unseaworthiness of the vessel. It is unclear from the wording of this interrogatory and its placement on the verdict form what this award was intended to cover.
After the verdict was returned, Noe's counsel requested the trial judge poll the jury to determine whether the $20,000.00 award was for maintenance and cure from the date of accident until trial. The trial judge refused this request, although he noted to the jurors:
I will tell the lawyers that it’s a verdict that we may have to talk about. I don’t mean anything about you all, because you all answered the questions like they were presented, but it is in sort of a different fashion that I anticipated, no doubt due to the poor way I worded the questions.
He then stated to the attorneys:
[Bjefore I sign any judgment in this case ... we’ll have to talk about it, because— and I’ll state for the record that this maintenance and cure question could have been better placed in the verdict. ... We’ll think about it, so we’ll keep it open.
The trial court then, without mention of the $20,000.00 figure, entered judgment for maintenance and cure in the amount of $35.00 per day, the sum the jury awarded for “additional” maintenance and cure, from April 5, 1983, indefinitely, until maximum cure is reached.
Noe contends that the $20,000.00 figure cannot be maintenance. He speculates it may have been a lump sum award for cure, i.e., medical expenses, and that a new trial should be granted on the amount of cure due plaintiff. Defendants contend, however, that the $20,000.00 figure was simply an unnecessary finding as to general damages.
If the $20,000.00 figure was intended by the jury as a finding of general damages, it should be disregarded by this court in our res nova review of quantum. See Mart v. Hill, at 1128. Noe submitted no evidence at trial of outstanding medical expenses other than the testimony of Dr. Blanda that his $1,010.00 bill was outstanding. Thus, an award of $20,000.00 for past medical expenses would be clearly wrong. Neither can the $20,000.00 properly be considered an award for future cure because a lump sum award for future cure is prohibited under general maritime law, which protects seamen from their own improvidence. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938). As noted above, Noe’s right to payment for future medical expenses, or cure, is protected by the judgment. Thus, Noe is not entitled to a new trial as to cure.
SUMMARY
In summary, applying the federal standard of appellate review, we affirm the trial court’s denial of Noe’s motion for directed verdict on his Jones Act claim. Applying the Louisiana standard of appellate review to Noe’s claims under general maritime law, we reverse the jury’s verdict that the PELICAN was seaworthy and render judgment in favor of Noe on his unseaworthiness claim in the total sum of $62,-000.00, at defendants’ costs.
*75 AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

. Mrs. Noe did not appeal the judgment against her on the loss of consortium claim, and that judgment is now final.

. A stricter standard prevails when the defendant seeks a directed verdict in a Jones Act case. A directed verdict for the defendant is proper only when there is a complete absence of supporting probative facts. Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La.1986); Theriot v. J. Ray McDermott & Co., 742 F.2d 877 (5th Cir. 1984).

. The parties stipulated prior to trial that Noe was a seaman aboard a vessel in navigation on navigable waters of the United States.