557 So.2d 999 (1990)
Blanca Lidia Manzanares OSORIO, et al.
v.
WATERMAN STEAMSHIP CORPORATION, et al.
No. 89-CA-0929.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 1990.
Writs Denied May 11, 1990.
*1001 Thomas J. Wagner, Michael H. Bagot, Jr., Wagner & Bagot, New Orleans, for defendants/appellants.
Robert J. Caluda, New Orleans, for plaintiffs/appellees.
Before LOBRANO, PLOTKIN and BECKER, JJ.
*1002 LOBRANO, Judge.
Frank Osorio was killed on May 10, 1985 while working aboard the LASH vessel S/S SAM HOUSTON. Osorio's widow, Blanca Osorio, filed this suit against Waterman Steamship Corporation the vessel's owner and Osorio's employer. She sued individually, as the legal representative of Osorio's estate, and on behalf of the couple's two minor children, seeking damages under the general maritime law, the Jones Act and the Death on the High Seas Act (DOHSA). In addition to the pecuniary losses allowed under the Jones Act and DOHSA, plaintiff also sought recovery for her husband's pain and suffering prior to his death (survival action) pursuant to the general maritime law. She seeks punitive damages as well.
The entire matter was tried before a jury who returned a verdict in favor of plaintiff in the amount of $350,000.00 for the survival claim, $180,000.00 for loss of support and services, $7,500.00 for funeral and burial expenses and $900,000.00 in punitive damages. The jury also found Osorio five per cent at fault. Pursuant to Waterman's motion for a judgment notwithstanding the verdict, the trial judge reversed the punitive damage award, but denied a new trial as to the other awards.
Both Waterman and plaintiff appeal. Waterman asserts the trial court erred in not granting a directed verdict and/or judgment N.O.V. on liability; that prejudicial errors were committed with respect to allowing the jury to consider punitive damages; that the survival damages are excessive and that it was error to award prejudgment interest. Alternatively, Waterman asserts that if they are liable, then Osorio's fault should be greater than 5%. Plaintiff asserts the trial judge erred in reversing the punitive damage award.
ISSUES:
1) Waterman's liability under either a negligence or unseaworthiness theory.[1]
2) The comparative fault of Osorio.
3) Whether punitive damages are recoverable under the facts and circumstances of this case.
4) Whether the jury was prejudiced in its damage award.
5) Excessiveness of the survival award.
6) Whether pre-judgment interest is proper.
THE ACCIDENT
The S/S SAM HOUSTON is a LASH (lighters aboard ship) vessel designed to transport its cargo on barges which are stored on the ship. The barges ("lighters") are raised and lowered on and off the stern of the vessel by the use of a gantry crane. The crane is located on tracks which run the length of the ship, on both the starboard and port sides. Barges loaded on the vessel are lifted by the gantry crane which then moves along its tracks to the designated hatch or cell where the barge will be stored for transport. Conversely, when the barge is removed from the vessel, it is lifted by the crane, maneuvered along the tracks to the stern of the ship, then placed in the water for transport to the shore.
Several facts about this procedure are certain. The crane cannot swing out over the side of the vessel. All loading and unloading is carried out over the stern. On both sides of the ship, outboard of the crane tracks, is a safety passageway. Further, the crane is equipped with "guide arms" which are designed to guide the placement of the barges in their respective cells. These arms extend inboard when the crane lowers a barge into position for storage. Finally, because the crane operator is situated on top of the crane and has limited vision, located on the starboard (right) forward, and port (left) stern legs of the crane were platforms upon which individuals, designated as "legman" stood watch. It was their job to insure the tracks, and the general area, are clear of debris or other obstructions during operations.
*1003 On May 10, 1989, the SAM HOUSTON was anchored in the Hooghley River near Haldia, India, a rural location approximately sixty miles from Calcutta. Osorio was an Able Bodied Seaman (AB) employed by Waterman aboard the vessel. About 2:30 p.m. cargo operations were being conducted under the supervision of Third Mate Ripley. At that particular time, it was necessary to remove a barge from hatch two E to hatch one F[2]. Osorio was part of the deck crew that would normally be involved in securing or unsecuring the turnbuckles, "dogs", hatch-wedges and other devices used to hold the barges in place.
Prior to the commencement of operations, the rear legman, Aden Ezell, testified he saw Osorio move from the port side to the starboard side of the ship. The operations started. As the barge that was being moved was lowered to its position over hatch one, the guide arms extended and crushed Osorio against another barge that was already secured in the "E" position of hatch one.
Apparently the electrician on deck was the first to see what had happened to Osorio. He immediately told Ripley who, in turn, immediately ordered the crane operator to cease operations. Ripley then positioned himself so that he could hold Osorio while the guide arms were retracted. Osorio was placed on a wire stretcher and remained on the deck while medical help was summoned. He was conscious, but was in pain. About thirty minutes later he was examined by Dr. Battacharyya, a quarantine doctor. About 4:pm he was taken ashore and examined by Dr. Kundu, a general practitioner. Both doctors agreed that the injuries were serious, and that X-rays were necessary to determine their extent. Osorio was then taken to a clinic at the Indian Oil Refinery where x-rays confirmed that at least ten ribs were fractured, and the left shoulder was crushed. At 6:15 p.m., after his fractures were immobilized, Osorio, accompanied by both doctors, was transported to a hospital in Calcutta approximately sixty miles away. At approximately 11:30 p.m., along the outskirts of Calcutta, his condition deteriorated and Osorio died.
SCOPE OF REVIEW
Before addressing the issues raised in this appeal we briefly discuss the standard of review in maritime cases. In federal court a judgment for the plaintiff on a Jones Act claim must be affirmed unless there is a complete absence of supporting probative facts. Thezan v. Maritime Overseas Corp., 708 F.2d 175 (5th Cir. 1983), cert. denied 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). However, a claim filed under the general maritime law is governed by the lesser standard of whether reasonable persons could have arrived at a contrary verdict. Fontenot v. Teleldyne Movible Offshore, Inc., 714 F.2d 17 (5th. Cir. 1983). Under the general maritime law, factual findings are reviewed under the "clearly erroneous" standard. Parks v. Dowell Div. of Dow Chemical Corp., 712 F.2d 154 (5th Cir.1983).
Without recognizing any distinction between the two types of claims, the appellate courts of this state, when reviewing a maritime claim, have consistently applied the stricter Jones Act standard of review. This court, in Huff v. Compass Nav. Inc., 522 So.2d 641 (La.App. 4th Cir.1988), writ denied, 526 So.2d 797 (1988), stated:
"This court would ordinarily have the authority under our state constitution to review both facts and law in civil cases. However under Federal law and jurisprudence, which we must apply when deciding cases under Federal statutes or maritime law, the jury's findings of fact cannot be disturbed on appeal unless there is no reasonable evidentiary basis for them." Id. at 644.

The Huff case involved both a Jones Act and general maritime claim.
*1004 However, in a per curiam opinion in Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La.1986), our Supreme Court recognized the two different Federal standards of review in maritime cases. In fact, the court questioned the correctness of applying either Federal standard to a maritime claim filed in state court, although no definitive ruling was made on that issue. Id. at 681 n. 3.
Based on our appreciation of the current jurisprudence on the subject, and the fact that Trahan v. Gulf Crews Inc., 260 La. 29, 255 So.2d 63 (1971), a Jones Act Claim, has not been overruled, we will apply the Federal standards, although it will result in a "hybrid" review of this case. Thus the Jones Act claim will be reviewed under the stricter approach, and we will apply the "clearly erroneous" standard to the general maritime claim.
WATERMAN'S RESPONSIBILITY
Plaintiff asserts her claim against Waterman under the general maritime law, the Jones Act and the Death on the High Seas Act (DOHSA). We first discuss the legal requisites of each claim and then we review the facts as they apply to each.
a) DOHSA and General Maritime Law

The shipowner, historically, has a non-delegable duty to provide a seaworthy vessel. Griffin v. LeCompte, 471 So.2d 1382 (La. 1985). That duty is absolute and is a species of liability without fault which is an incident of vessel ownership. Id. Liability under an unseaworthiness claim is completely divorced from negligence concepts. Waldron v. Moore McCormack Lines, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). Causation in an unseaworthiness action is "proximate cause in the traditional sense." Noe v. Radcliff Materials, Inc., 510 So.2d 69 (La.App. 1st Cir. 1987), writ denied, 513 So.2d 822 (1987). "Proximate cause means `(1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" Id. at 72, quoting from Smith v. Trans-World Drilling Co., 772 F.2d 157, 162 (5th Cir. 1985).
A seaworthy vessel is one that is reasonably safe for its intended use. Noe v. Radcliff Materials, Inc., supra. A defectively equipped vessel is unseaworthy in the purest sense of the word. Rains v. Diamond M. Co., 396 So.2d 306 (La.App. 3rd Cir.1981); writ refused, 399 So.2d 623 (1981); cert. denied 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). Included in the shipowner's warranty of seaworthiness is the duty to provide an adequate and competent crew. Stoot v. D & D Catering Service, Inc., 618 F.Supp. 1274 (D.C.La. 1985), affirmed 807 F.2d 1197 (5th Cir.), cert. denied 484 U.S. 821, 108 S.Ct. 82, 98 L.Ed.2d 44 (1987).
Recovery for a seaman's wrongful death occurring more than one marine league from the shore of any state is recognized under the Death On The High Seas Act (DOHSA). That act was Congress' response to the U.S. Supreme Court's decision in The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886) which precluded wrongful death remedies under the general maritime law. DOHSA provides:
"Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the dependent may maintain a suit for damages in the district courts of the United States, in admiralty for the exclusive benefit of the decedent's wife, husband, parent, child or dependent relative against the vessel, person or corporation which would have been liable if death had not ensued." 46 U.S.C. 761.

Thus, a claim for wrongful death, predicated on the unseaworthiness of the vessel, is brought pursuant to DOHSA's provisions. However, DOHSA's remedies are limited to actual pecuniary losses. 46 U.S.C. 762. Recovery for the mental anguish and grief of the dependents is not permitted. See, Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806 39 L.Ed.2d 9 (1974).
*1005 Although the U.S. Supreme Court, in Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), held that a wrongful death action, including non-pecuniary loss remedies, could be brought under the general maritime law, that decision was limited to deaths which occurred in state territorial waters. This position was reaffirmed in Mobil Oil Corp. v. Higgenbotham, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), wherein the court held that where a death occurs on the high seas, outside a state's territorial waters, the remedies under the general maritime law could not supplement DOHSA's remedies. That is, DOHSA provides the exclusive remedy for wrongful death occurring within its jurisdictional limits.
The survival action, however, poses a different question. DOHSA does not contain a survival provision. Subsequent to the Moragne decision, numerous courts have held that the general maritime law includes a survival action "permitting recovery of a decedent's pre-death damages." Azzopardi v. Ocean Drilling & Exploration Co., 742 F.2d 890 (5th Cir. 1984), at 893, and cases cited therein. In Azzopardi, the Court concluded that Mobil Oil Corp. v. Higginbotham, supra, did not preclude the joining of a survival action under the general maritime law with a wrongful death claim under DOHSA. The court's reasoning is predicated on the basic difference between the two types of recovery, and the courts' historical role of "filling the gaps" left by Congress in DOHSA's enactment.
Thus, this Court is satisfied that plaintiff may assert a claim for Osorio's wrongful death, predicated on the vessel's unseaworthiness, under DOHSA. Damages under DOHSA are limited to pecuniary losses. Plaintiff may supplement the DOHSA claim with a survival action under the general maritime law (unseaworthiness) for decedent's pain and suffering prior to his demise.
b) Jones Act

In 1915 Congress enacted the Jones Act, 46 U.S.C.App. 688. That act created "... a statutory cause of action for both injury and death resulting from the negligence of the owner directly, or vicariously through the negligent acts of the master or members of the crew." Complaint of Merry Shipping, Inc., 650 F.2d 622 (5th Cir.1981). The Jones Act grants to a seaman a cause of action against his employer which requires a showing that the injuries were the result of only the slightest negligence. Rains v. Diamond M Co., supra. This "producing cause standard", different from a "proximate cause" standard, is derived from the incorporation of the Federal Employers' Liability Act (45 U.S.C. 51) into the Jones Act. See, Joyce v. Atlantic Richfield Co., 651 F.2d 676 (5th Cir.1981).
A Jones Act employer is under a duty to provide his seaman-employee a safe place to work. That is, "... a place where the employee can work without exposure to an unreasonable risk of harm. Failure to exercise reasonable care to fulfill this duty is negligence." Huff v. Compass Nav., Inc., supra at 645. A jury verdict under the Jones Act should be sustained when there is evidence from which a jury might reasonably infer negligence. Rains v. Diamond M Co., supra. A deceased seaman's survivors, under the Jones Act, may maintain a survival action. However, their own recovery is limited to pecuniary losses. Complaint of Merry Shipping, Inc., supra. Congress did not intend to provide Jones Act liability for nonpecuniary losses, such as loss of society. Ivy v. Security Barge Lines, Inc., 606 F.2d 524 (5th Cir.1979), cert. denied 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980).
Thus, although plaintiff's remedies under a claim of unseaworthiness and the Jones Act are the same, i.e. pecuniary loss and survival action, the burden of proving causation and the standards of review are different. We apply these legal principles to the facts of this case.
c) Factual Conclusions
Plaintiff argues that there is substantial evidence to support a finding that the S/S Sam Houston had defective *1006 and improperly designed equipment, and that the crew was grossly inattentive and negligent. In support of this she relies on the testimony of the crew, and the expert testimony of retired Admiral Ben Lehman.
Waterman argues that the S/S Sam Houston is one of the best maintained and most seaworthy vessels in the U.S. Merchant Marine. It points to the numerous original safety features of the vessel, plus the additional safety devices added subsequent to original construction. Waterman argues that the testimony of the crew members, and its expert, William Handlin, support the position that there was no equipment malfunction, nor inattentive crew.
For the following reasons, we conclude that the evidence does not support a finding a unseaworthiness due to defective equipment. However, there is sufficient evidence to support the jury's finding of unseaworthiness and Jones Act liability based on an inattentive and neglectful crew.
The operation of the gantry crane is designed to allow the movement of the "lighters" to and from the ship, or from one location (cell or hatch) on board to another. The crane is moved along tracks running fore and aft. The outboard side of the crane is a safety area which protects the crew's movement while the crane is in operation. When a barge is positioned over a cell, the guide arms extend from the crane to assure proper alignment of the barge for storage. The two legmen positioned on platforms on the starboard-forward side and the port-aft side of the crane are equipped with sound powered telephones to the crane operator. They also have automatic stop buttons. The area where the guide arms extend is painted yellow to signify a danger area. An automatic Klaxon horn is sounded in advance of the extension of the guide arms and remains activated until the operation is complete. A manually operated siren would be activated by the crane operator in advance of any crane movement, and bells sounded automatically as the crane moved along the track.
Plaintiff's expert, retired Admiral Ben Lehman, testified that the equipment was defective in several respects. First he opined the legman were positioned in such a fashion that they could not see the entire perimeter of their watch area. Second, the operations should have been controlled by a "go" button rather than a "stop" button. He opined that "go" buttons are safer because they allow operations to begin only when each legman is satisfied that it is safe to do so. Third, the "stop" buttons would not stop the guide arms during operations; that is, they could not be stopped in mid-course. Once they started their extension, they could not be stopped until fully extended. Thus he concluded that these various unsafe features made the vessel unseaworthy.
Despite Lehman's numerous objectionable features, liability for unseaworthiness requires evidence that the condition complained of was a cause in fact of the accident. There is no evidence that any of these particular "defects" was a proximate cause of Osorio's death. Thus defective equipment is not the unseaworthy condition which imposes liability. We reach a different conclusion however with respect to the actions of the crew.
Third mate William Ripley was in charge of supervising operations on the day of Osorio's accident. He testified that the chief electrician, the crane operator, the two legmen, and boatswain Leake were among those involved in the operations. He was in communication with the crane operator by a two-way walkie talkie. He stated that the legmen have the responsibility to watch the tracks prior to crane movement. The crane operator has very limited vision. Ripley did not see Osorio until the chief electrician told him to stop the crane. Operations ceased immediately and Osorio was removed to a stretcher on deck. Ripley testified that there was no reason for Osorio to be in the area where he was injured. He stated that the starboard legman could have seen him prior to the order to lower the barge. Ripley and Boatswain Leake were the first to reach Osorio.
*1007 Aden Ezell was the port aft legman on the day of the accident. He testified that his duties were to make sure that there were no obstructions in the track as the crane moved. On further questioning, however, he expanded this duty "to observe and make sure there is nothing that would be in danger." Prior to the commencement of operations, Ezell told Osorio that "this is going to be a shift", meaning a barge movement from one hatch to another. He then saw Osorio move from the port to the starboard side of the ship, heading forward, but did not see him return to the danger area.[3] He suggested that there were other barges that may have blocked his view. Assuming the area to be clear, Ezell gave no warnings to the crane operator, and the lowering of the barge commenced. Only after there was a hesitation in the crane's movement did Ezell see Osorio's hand between the barge and the guide arm. Ezell testified that he had no reason to look in the area where Osorio was injured since there was no reason for anyone to be there.
David McCullough has an AB rating. He was positioned at the starboard gangway, about one hundred fifty feet from where Osorio was injured. He did not see the accident. However it was his testimony that there were any number of reasons why Osorio could have been in that area. He testified that, as part of the deck crew, Osorio would have been responsible for lashing, wedging and securing barges. He would have been required to clear the area of all obstructions prior to the barge placement. He particularly noted the possibility of ladders in the area since the barge was located above deck and ladders would be needed to fasten or unfasten them. He stated that the boatswain would assign the seamen to whatever location they were needed.
It was also McCullough's testimony that on the day of the accident, the sound powered telephones were not put out, and therefore, there was no communication between the port and starboard legman and the crane operator. The mate on watch and the electrician were the only persons with radio contact with the crane operator. Thus, for the legman to communicate with the crane operator he had to shout down to the mate who then would communicate with the crane by way of his walkie-talkie.
Donald Ramsey, the second mate, was not on duty at the time of the accident. He was in the ship's lounge. Ramsey was told by Chief Mate Price to accompany Osorio ashore. They went ashore after Dr. Bhattacharyya arrived. He then accompanied Osorio to the Indian Oil Refinery Clinic, where X-rays were taken. Ramsey testified that, although Osorio was in pain, his situation did not seem life threatening as Osorio was talking with various people on the dock while awaiting transportation. He also testified that Osorio was given oral pain medication on the dock, and that he was given a shot for pain while at the clinic.
Ramsey confirmed Ripley and Ezell's testimony that the specific reason for the legmen is to watch for the safety of the crew during operations.
Boatswain Herbert Leake was in charge of the deck crew. He testified that Osorio should have been checking the "dogs" on No. 2 hatch, a distance of about 3 feet from hatch one. He was not supposed to be in the danger area. Leake did not see the accident happen, but immediately thereafter helped Ripley get Osorio free and on a stretcher. Leake testified that Ezell could not have seen him because his view would have been obstructed.
We conclude that at least one of the legmen, most probably Ezell, should have seen Osorio, but didn't. We do not have the testimony of the starboard-forward legman. Although the other crew members were in various positions that may have prevented their vision of the "danger area," the testimony is consistent that the legmen have a duty to see the area, and watch for the safety of others. Ezell admitted *1008 that he didn't look in the area because he thought there was no reason for anyone to be there. However, there is evidence to suggest various reasons why Osorio was there. At the very least, the aft legman, Ezell, was in a position to see Osorio, should have seen him, but did not.
Based on the standards of review discussed earlier in this opinion, we find no clear error in the jury finding the vessel unseaworthy, and Jones' Act responsibility, based on the neglect and inattention of the crew.
OSORIO'S FAULT
The jury found Osorio 5% at fault. Waterman seeks an increase of that fault, while plaintiff argues there was no fault on Osorio's part. Waterman particularly argues that there was no reason for Osorio to be in the danger area, and thus there was no reason for the legmen, or anyone else, to expect him to be there.
The evidence shows that Osorio was an experienced seaman who had served on the S/S Sam Houston several months prior to the accident. All four crew members were in agreement that Osorio was a careful and dependable worker, and was not the type to take risks. There is no evidence that he was assigned any particular duties in the area where he was injured, yet he was in that area. The evidence, particularly McCullough's testimony, suggests several explanations. We must first assume that Osorio would not intentionally place himself in a position of danger. The jury had sufficient evidence to conclude that he was in the area for a specific job related reason, although there may not have been a direct order from his superior. Osorio could have seen something that needed moving and thought he had sufficient time to complete the task. Of course it is equally plausible, as Waterman suggests, that Osorio was inattentive, failed to hear the warning buzzers and wandered into the danger area without realizing it.
Although we cannot determine for what reason Osorio was in the area, we cannot say the jury was clearly wrong in assigning 5% fault to him. A seaman's duties to protect himself is tempered by the realities of maritime employment. Johnson v. Offshore Express, Inc., 845 F.2d 1347 (5th Cir.1988), cert. denied ___ U.S. ___, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). A seaman's duty to protect himself is slight care, not ordinary care. Pickle v. International Oilfield Divers, Inc., 791 F.2d 1237 (5th Cir.1986), cert. denied 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). We therefore will not disturb the apportionment of fault.
PUNITIVE DAMAGES
The trial judge, by means of a J.N. O.V., overturned the jury's verdict granting plaintiff punitive damages. Plaintiff appeals asserting the trial court erred. Waterman asserts that punitive damages are unconstitutional, that as a matter of law they are not allowed under the Jones Act, DOHSA and/or the general maritime law, and that, factually, they are inapplicable to the instant case.
Because of the result we reach on the facts it is not necessary to discuss the constitutionality of punitive damages. Although there is serious doubt as to whether punitive damages are recoverable under the Jones Act or DOHSA, we are satisfied, as a matter of law, they are permitted under the general maritime law. Simmons v. Hope Contractors, Inc., 517 So.2d 333 (La.App. 1st Cir.1987), writ denied 518 So.2d 510 (La.1988); Complaint of Merry Shipping, Inc., supra.
"Punitive damages ... may be recovered when a wrongdoer has acted willfully and with gross disregard for the plaintiff's rights. They serve the purpose `of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example.'" Complaint of Merry Shipping, Inc. at 625. "Punitive damages should be available when a shipowner has willfully violated the duty to furnish and maintain a seaworthy vessel." Id. Conduct which supports an award of punitive damages requires an element of bad faith. Simmons v. Hope Contractors, supra. Such conduct exhibits gross negligence and/or a reckless or callous disregard *1009 for the rights of others. Protectus Alpha Nav. Co., Ltd. v. North Pacific Grain Growers, Inc., 767 F.2d 1379 (9th Cir.1985).
The jury's award of punitive damages was predicated on the "willful and wanton" failure to provide a seaworthy vessel, and the "arbitrary" refusal to provide adequate medical treatment.
Plaintiff argues that "defendant's choice of unsafe and inoperative equipment was willful, that the actions of the crew members under defendant's control exhibited a wanton disregard for safety, and that the resulting combination rendered the vessel so grossly unseaworthy that punitive damages were ... obviously justified." We disagree. Reviewing the record, we find no evidence that suggests the owner of the vessel was so "grossly neglectful or reckless" as to warrant being "punished" for its acts. There is absolutely no showing of bad faith in equipping the vessel or in the crew's conducting its operations. Although, as we previously noted, the jury had sufficient evidence to find an unseaworthy condition (i.e. the neglect and inattention of the crew) which was the "procuring" and "proximate" cause of plaintiff's death, the evidence does not show such gross neglect as to justify a punitive damage award for unseaworthiness.
We express the same opinion with respect to the issue of adequate medical treatment. After review of the record we are in agreement with the trial judge that punitive damages are not warranted.
Plaintiff's main argument focuses on Waterman's delay in seeking medical treatment for Osorio, and the "improper treatment" immediately after the accident. Osorio was injured at 3:00 p.m. Approximately one-half hour later he was examined by Dr. Bhattacharyya, an Indian quarantine doctor. At about 4:00 p.m. he was taken ashore and examined by Dr. Kundu, a general practitioner. At approximately 4:30 p.m. he was transported to the Indian Oil Refinery Clinic where x-rays were taken. It was determined that he suffered a crushed left shoulder and ten fractured ribs. Because the clinic was not equipped to treat him, the decision was made by the two doctors, in consultation with Dr. Sangal, a surgeon, to transport him to a hospital in Calcutta, sixty miles distant.
After his fractures were immobilized, at approximately 6:15 p.m. Osorio, Dr. Bhattacharyya and Dr. Kundu departed for Calcutta. At approximately 11:30 p.m. Osorio's condition worsened and he died.
Plaintiff points to the testimony of Drs. Contreary and Ewin that Osorio should have immediately been transported to the Calcutta hospital. Plaintiff also cites the "error" of the two Indian doctors in not administering pain medication and/or an I.V. drip during Osorio's ordeal.
Waterman asserts that plaintiff is "second guessing" the decision of the doctors. They argue that under the circumstances of this case, the medical treatment did not fall below the standard of care required, and certainly did not constitute such wanton neglect as to warrant punitive damages.
Fitzgerald v. A.L. Burbank & Co., 451 F.2d 670 (2nd Cir.1971), cited by plaintiff, generally sets forth the applicable standards with respect to a shipowner's duty to provide cure. The court noted:
"Both the duty to provide maintenance and cure and the Jones Act are maritime provisions designed to compensate for the often harsh and dangerous life of a seaman. To require him to prove the standard of care of the medical profession in a far distant land is incompatible with their intent and purpose. Assuming that reasonably adequate medical facilities were available, the proper standard for malpractice is simply whether the physician exercised the degree of care and skill of the average qualified practitioner of the art and science of medicine. The defendant, however, must bear the burden of proving that adequate medical facilities or services were not reasonably available or that the circumstances were such that the standard could not possibly be applied." Id. at 680.

Plaintiff cites numerous cases which hold that a ship owner is vicariously liable for *1010 the "malpractice" of the physician engaged to treat a crewmember. We do not disagree with that legal principle. However, we must not lose sight of the forest because of the trees. The issue we are confronted with is whether the medical treatment was so neglectful or inadequate as to warrant a punitive damage award, not just whether they were inadequate. We have already determined that Waterman is liable for Osorio's death.
This accident occurred in a remote, rather primitive area of India. Both treating physicians (Indian doctors) felt it was necessary to x-ray Osorio to better understand the nature of his injuries. Although neither doctor confirmed that pain medication was administered, plaintiff's expert, Dr. Contreary, admitted that "one can argue either way" on that issue. He would have deferred to the treating physicians. Dr. Ewin testified that the rule is to give patients as little as possible while diagnosing their injuries. The evidence shows that the Indian physicians felt it necessary to immobilize Osorio before moving him to Calcutta.
Basically Dr. Contreary agreed to a great extent with the decisions of the Indian doctors, although he opined that the overall medical treatment fell below the medical standards of this country. He suggested that an electrocardiogram, more x-rays, and I.V. drip all should have been immediately performed. However, he could not testify that there existed suitable facilities in Haldia, India, to accomplish this further treatment and admitted that, under the circumstances, the physicians probably did the best they could.
Plaintiff argues that the expert testimony of Lehman suggests different modes of transporting Osorio to Calcutta were available and should have been utilized. He suggested that the trip would have been quicker by boat. Plaintiff argues that the failure of Waterman's employee, Third Mate Donald Ramsey, to accompany Osorio to Calcutta evidences their callous disregard of his welfare.
We agree with Waterman that plaintiff's assertions are speculative after thoughts or second guessing. Given the circumstances of this case we agree with the trial judge that there was insufficient evidence to support punitive damages. Waterman obtained local, qualified physicians to attend to Osorio. Perhaps by western standards their medical capabilities were inferior. However, there is no evidence to suggest that there existed superior personnel in the area and that Waterman refused their services. Nor is there evidence to suggest that Waterman was so grossly negligent under the circumstances, or that it willfully refused to obtain medical treatment as to warrant punitive damages. Plaintiff's argument on this issue suggests that Waterman should not have trusted the physicians, but should have taken matters in their own hands. This argument does not warrant punitive damages.
Further the evidence does not show that pain medication was an absolute necessity. Ramsey and Leake both testified that Osorio didn't appear to be in pain. Drs. Contreary and Ewin opined that it was a judgment call on the part of the treating physician. Thus we find no reason to award punitive damages.
PREJUDICIAL JURY CHARGES
Waterman argues that the court committed prejudicial error in allowing the jury to consider the issue of punitive damages. They assert that plaintiff used that issue to inflame the jury and incite their sympathy and passion for Osorio's survivors. Waterman strenuously urges this deprived them of a fair and considered opinion by the jury, and warrants a reversal or a new trial.
We have already determined that, as a matter of law, punitive damages may be recovered in cases of this type. We have also determined that the trial court was correct, from a factual standpoint, that punitive damages are not warranted in this case. Although the trial judge may have expressed reservations when the issue was submitted to the jury, as discussed below, the damages awarded are not so excessive as to indicate a highly prejudiced jury. We find no merit in Waterman's argument.
*1011 EXCESSIVE DAMAGES
Waterman argues that the award of $350,000.00 for Osorio's pain, suffering and mental distress prior to his death is excessive. They seek a reduction by this court. In support they cite cases where lesser amounts, ranging from $5,000.00 to $50,000.00 were awarded. Plaintiff cites Bergen v. F/V St. Patrick, 816 F.2d 1345 (9th Cir.1987), cert. denied ___ U.S. ___, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989), where $200,000.00 was awarded to the estate of a seaman who lived only two minutes in icy waters before drowning.
The well established rule in this state with respect to damage awards requires us to determine, first if the award constitutes an abuse of the fact finder's great discretion, and second, if so, then whether we should lower it to the highest amount permissible. Each case should be considered on its own facts and circumstances, and other awards will be considered only after an abuse of discretion is found.
Osorio lived for approximately eight and one-half hours after his injury. His injuries were serious and painful. He was in a strange land, was treated by strangers, and died while on the outskirts of Calcutta. The evidence suggests that he was not administered sufficient pain medication. In view of these facts we cannot say that the jury abused its discretion in awarding $350,000.00 for his survival claim. Certainly had he lived through the ordeal such an award would have been within the jury's discretion.
PRE-JUDGMENT INTEREST
Waterman asserts that the trial court erred in awarding pre-judgment interest. We agree.
Pre-judgment interest is not allowed in actions brought solely under the Jones Act. Theriot v. J. Ray McDermott & Co., 742 F.2d 877 (5th Cir.1984). However, when a claim is brought under the Jones Act and the general maritime law, the courts of this state have recognized that pre-judgment interest is discretionary with the trial judge. Wright v. Ocean Drilling & Exploration Co., 444 So.2d 129 (La.App. 4th Cir.1983), writ dismissed 445 So.2d 431 (La.1984); Hirstius v. Louisiana Materials Co., Inc., 413 So.2d 611 (La.App. 1st Cir.1982), writ denied, 415 So.2d 943 (La.1982).
In McPhillamy v. Brown & Root, Inc., 810 F.2d 529 (5th Cir.1987) the court held that where the jury did not apportion the damages between the Jones Act claim and the unseaworthiness claim, and where the entire damages could have been awarded under either, pre-judgment interest is not allowed. The situation is the same in the present case.
The jury found Waterman liable under the Jones Act and the general maritime law unseaworthiness doctrine. The damages awarded, survival claims, punitive losses and funeral expenses, were recoverable under either theory. We therefore conclude that it was error to award pre-judgment interest, and we reverse that portion of the judgment.
For the reasons assigned, we reverse the award of pre-judgment interest. In all other respects the judgment is affirmed. Costs are assessed to appellant.
AFFIRMED IN PART, REVERSED IN PART.
NOTES
[1] Although Waterman presents this issue as error in failing to grant a directed verdict and/or J.N.O.V., the issue is more properly whether there is sufficient evidence to support the jury conclusions. This issue necessarily involves a complete review of the evidence.
[2] The cells or hatches are designated one through seventeen, with cell one being the most forward, and cell seventeen the most aft. The letter designations are the levels of barge storage. The A through D designations are below decks, and the E and F designations are above the main deck. Thus the movement involved in this accident was from the E level of hatch two to the F level of hatch one.
[3] The actual area where Osorio was crushed is approximately two feet square and is located immediately aft, on the starboard side, of hatch one. We refer to this area as the "danger area." It was painted yellow.