633 So.2d 1274 (1994)
John William BUTLER, Plaintiff-Appellant,
v.
ZAPATA HAYNIE CORPORATION, Defendant-Appellee.
No. 92-71.
Court of Appeal of Louisiana, Third Circuit.
February 23, 1994.
Rehearing Denied April 6, 1994.
*1276 Raleigh Newman, Lake Charles, for John William Butler.
James Buckner Doyle, Lake Charles, for Zapata Haynie Corp.
Before DOMENGEAUX, C.J., and STOKER, THIBODEAUX, COOKS and SAUNDERS, JJ.
THIBODEAUX, Judge.
In this action brought under the Jones Act, 46 U.S.C.App. § 688, for negligence, the general maritime law for unseaworthiness of the vessel, and for punitive damages, attorney fees, and penalties for failure to provide maintenance and cure, the plaintiff, John Butler, appeals a judgment in favor of Zapata Haynie Corporation, defendant and owner of the fishing vessel, M/V Oyster Bayou, on which plaintiff claims he was injured on April 24, 1989.
After the presentation of plaintiff's case in this non-jury trial, the trial court granted Zapata's motion for involuntary dismissal of the unseaworthiness claim. At the completion of the trial, the court concluded that an accident had not occurred and dismissed plaintiff's remaining claims.
John Butler filed this appeal from the judgment of the trial court. We affirm the judgment as it relates to the dismissal of the unseaworthiness claim, and reverse and render on the Jones Act negligence claim and the refusal to award maintenance and cure benefits. We decline to award punitive damages and attorney fees.

FACTS
Butler was a member of the crew of the M/V Oyster Bayou which was engaged in catching menhaden, or "pogy," fish in the Gulf of Mexico. His job was that of a cork puller in the mate boat, one of two purse boats which is a powered launch carried by the main vessel, or "steamer." The purse boats encircle the schools of menhaden with a large drawn net. Each purse boat has a power block mounted on a large swivel boom. This power block weighs approximately 300 pounds and is used to lift the net after the fish are caught. It is hydraulically powered from the engine on the purse boat.
Butler claims he was struck on the left side of his head by the power block which was being operated by Aldoise "Cookie" Hampton whose regular job was that of a cook or ring setter. This blow caused a herniated cervical disc at the C5-6 level of the neck as the principal injury which left him disabled.
John Butler, the plaintiff, testified that he was working in the mate purse boat with, among others, Frank Robinson and Aldoise "Cookie" Hampton, the block operator. The block was located behind him as he was working with the net near the time the accident occurred. George Lemelle, a crew member, yelled at him to "watch out." At about that time, he saw Hampton "fighting" with the control levers. As he turned to determine what danger was involved, he was almost immediately struck by the block. He recalls waking up later in his bunk in the "hold" of the boat.
When his captain, Bruce Mason, visited him in the hold, he advised Mason of pain in his head, chest and left arm areas. Shortly thereafter, Mason brought him ashore and instructed him to report the incident to his pilot because of Mason's inability to write a report. As he, Butler, was giving a narrative to the pilot, Mason interrupted them and accused Butler of "making a case." Butler testified that Mason then escorted him off of the premises. He ultimately went home after returning to Zapata's plant to request that an accident report be made.
According to Butler, a friend offered to transport him to a doctor on April 25th, the day after the accident. Instead, he was brought to Attorney Gano Lemoine's office who arranged an appointment with Dr. *1277 Frank Robbins, a specialist in industrial medicine and Board certified in surgery and emergency medicine. Butler was examined by Dr. Robbins on April 26, 1989. Dr. Robbins referred him to Dr. William Foster, a neurosurgeon, who recommended physical therapy. Dr. Robbins also recommended an MRI diagnostic procedure, but Butler had to forgo this testing because no one would pay for it, including Zapata.
Butler's testimony was corroborated by Oscar Dudley, a cousin by marriage. Because of a malfunction in the netting process, the fish could not be lifted and pumped into the steamer. Consequently, the fish had to be released. A crewman yelled for the ring setter to operate the block for the purpose of swinging it over. Apparently, according to Dudley, the incorrect lever was used by the operator which caused the block to swing around and strike Butler. Dudley further testified that the block had been functioning improperly and the crew had knowledge of this. Specifically, he stated that it was difficult for an operator to control the direction of the block swing once it began moving. He assisted the plaintiff in getting to the steamer after the occurrence. Butler advised him that his hand, arm and back areas were in pain.
In his initial statement given to Joanna "Jody" Olsen, the claims representative for Zapata, two days following the accident, Dudley stated that he heard someone yelling to move the power block and heard the power block striking Butler's helmet on the left side, but Butler continued to work. Butler later told him that his arm was bothering him and he had a headache. Dudley's deposition testimony contradicted his initial statement in that it substantially tracked his trial testimony. His deposition and trial testimony emphatically stated that Butler was hit in the head and bent over, but not to the floor level after being hit. When confronted with the disparities in his various statements, Dudley explained that he was less than truthful in his statement to the claims representative because he wanted to preserve his bonus of $500.00 which each crew member received for an accident-free season.
George Lemelle, another crew member of the M/V Oyster Bayou, testified that he saw the block strike Butler on the left side of the head. After the blow, Butler was taken down to his bunk area of the steamer.
In support of its position that an accident did not occur, Zapata's captain, Bruce Mason, testified that he witnessed an occasion on April 24th when Butler's hat brim was hit by the power block. Butler, however, continued working and the fishing operation was not interrupted. Mason felt that Butler was uninjured by the minor impact. When he later checked on Butler in the bunk area of the steamer, Butler was experiencing difficulty in "catching his breath," although Mason admitted that Butler was also complaining about pain in his head area for which he supplied some aspirin. Mason subsequently filed an accident report and described the accident as "minor."
On cross-examination, Mason indicated that he had heard crew members talking about Butler being hit by the power block. He further admitted that it was possible for Butler to become injured by an event which he did not witness. Butler initially voiced a desire for medical treatment but, according to Mason, changed his mind after they engaged in an argument.
Mason's testimony also verified that the company had problems with the controls on the power block "for a period of time" before the accident, but he was uncertain if the problem was corrected before leaving on the date of the accident.
The other primary defense witness on the issue of liability was Aldoise "Cookie" Hampton, the power block operator on the day of the accident whose regular job was that of a cook and ring setter on the boat. Hampton said that nothing was wrong with the power block. The block, however, could have struck Butler without his (Hampton's) knowledge. He admitted moving the block because it appeared as though a collision between the purse boat and the steamer was imminent. He admonished the crewmen to "look out" when the block began moving. Hampton did not see Butler being hit; he only heard about it from crew members. However, he went into Butler's bunk area to *1278 inquire about his condition because he knew that Butler had "got hurt." He testified that he observed a "nail scratch" on Butler.

TRIAL COURT'S FINDINGS
The ultimate conclusion of the trial court was that Butler failed to prove an accident. It reached this determination by judging the plaintiff's case solely on the credibility of John Butler, the plaintiff, and two of his witnesses, Oscar Dudley and George Lemelle, who was mistakenly identified as "Philip Lemelle" in the trial court opinion. It identified their credibility as "nonexistent" while apparently giving credence to the testimony of the two main witnesses for Zapata on the issue of liability.
For the reasons expressed below, the trial court was manifestly erroneous in its findings.

ISSUES
The issues are:
(1) Whether the trial court committed manifest error in failing to find that an accident occurred;
(2) Whether the trial court committed manifest error in failing to find negligence on the part of Zapata Haynie Corporation;
(3) Whether the trial court committed manifest error in granting a directed verdict on the issue of unseaworthiness and in failing to find that the M/V Oyster Bayou was unseaworthy;
(4) Whether the trial court committed manifest error in failing to make an award for maintenance and cure; and,
(5) Whether the trial court committed manifest error in failing to find the actions of Zapata Haynie to be arbitrary and capricious for their failure to pay maintenance and cure, in failing to award penalties, punitive damages, and attorney fees against Zapata on the issue of maintenance and cure.

DISCUSSION
An appellate court in Louisiana is constitutionally authorized to review both law and facts. La. Const. art. V, § 10(B). This court is acutely aware of the oft-quoted rules of appellate review. Just recently in Stobart v. State of Louisiana, Through DOTD, 617 So.2d 880, 882 (La.1993), our supreme court instructed us that:
(1) A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.' Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.

Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. (Emphasis supplied).
Balanced against these directives is the idea that:

*1279 "[t]he principles of appellate review do not require an appellate court to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles. Mart v. Hill, 505 So.2d 1120 (La.1987)."
Dugas v. Fontenot Motors, 510 So.2d 1374, 1376 (La.App. 3d Cir.1987). In other words, an intermediate appellate court is not required to follow blindly the factual determinations of a trial court without discerning whether that court's discretion in evaluating facts and credibility has been abused. Certainly, the fact finder should be accorded great latitude and discretion, but discretion must always be buttressed by sound judgment. It is not immutable. To extend the quality of immutability to a fact finder's determinations simply because it articulates the magical word, "credibility" effectively limits and circumvents an appellate court's constitutionally given power to review facts.
Against this background, then, what documents, objective evidence, objectively-corroborated testimony, or uncontradicted testimony exist which militate in favor of rejecting the trial court's factual findings and credibility determinations?
The trial court specifically found that "[p]laintiff's version of events rest [sic] solely upon his testimony and that of two other crew members of the M/V Oyster Bayou, namely Oscar Dudley and George Lemelle." (Emphasis supplied). The record does not support this finding. Zapata's claims representative took recorded statements from each crew member on April 26, 1989. The statements were later transcribed and entered into evidence. Frank Robinson, for example, saw Butler being struck by the rear of the block. Robinson declared that if Butler had been hit with the "front" portion of the mechanism, he would have been killed. This obviously demonstrates the intensity of the force by which the 300 pound block is propelled by hydraulic power. The force, according to Robinson, knocked Butler off the railhe was "bent over" and "went down." This statement corroborates what Dudley observed, that Butler was hit in the head and "bent over." Butler did not appear to be hurt, although he was definitely hit. Nonetheless, Butler complained to Robinson about chest pains, a headache, and pain from his head to his arm. Because Captain Mason was busy, he did not witness the incident, Robinson's statement indicated.
The trial court observed that the Butler LemelleDudley versions of the accident were "directly contradicted by Bruce Mason... and Aldoise Hampton." This observation again is not supported by the record. Mason admitted witnessing an incident of the power block striking the brim of Butler's hat. Mason testified that "I seen when he got hit the time I seen him get hit" and "[w]e wasn't up against the steamer. That's the reason I say I don't know when this fellow got hit. I seen him get hit ..." On cross-examination, Mason simply denied that Butler was injured by what he claimed to be a minor accident, but did not repudiate the fact of some contact of the 300 pound block with Butler's hat. Thus, Captain Mason's version does not contradict Butler's; in fact, it corroborates it. The only divergence concerns the severity of the impact which is an issue for resolution by the medical providers.
Hampton admitted that he may not have been able to see everything from his position as operator of the block. He simply stated that he did not see anyone being hit by the block and did not notice any work interruption. In fact, Hampton's testimony corroborates to a certain extent the plaintiff's version. The block could have struck Butler without Hampton's knowledge, according to Hampton. Moreover, Hampton hollered "look out" when the block started to move, and he also heard someone yell to "watch the block," just as Butler testified to. Although Hampton stated he did not strike Butler with the block, he knew that Butler "got hurt," prompting him to check on Butler's condition.
Because it was faced with such "contradictory testimony," the court felt that it had to decide whether plaintiff's version was trustworthy. The only plausibly contradictory *1280 testimony was Hampton's and even his version of the event was equivocal.
The trial court found it "important to note that the plaintiff did not connect [his] condition to any incident on the purse boat or to any accident." (Emphasis supplied). The record again does not substantiate this "important" finding:
THE COURT: It (the power block) swings pretty violently when ...
THE WITNESS (MASON): Yeah, at times or, you know, when it's rough if you've got any slack in it, it will, yeah.
THE COURT: When you got word that Mr. Butler was in the hold of the boat, was that after the set was complete?
THE WITNESS: After the set was complete, yeah.
THE COURT: And you visited with him down in the hold?
THE WITNESS: Yes.
THE COURT: Did he say he had gotten hit in the head by the block?
THE WITNESS: He told me he got hit.
THE COURT: By the block? I mean...
THE WITNESS: Yeah, block.
Captain Mason filed an accident report, as the trial court found. Yet, Leonard Nunez, the insurance claims specialist for Zapata, and Richard Brunner, its corporate risk manager, denied that any such report had been filed or that an accident of any sort had occurred.
The lower court found Butler's credibility to be lacking because he: (1) admitted making false statements in his job application relating to previous loss time accidents; (2) intentionally failed to mention an automobile accident; (3) does not file income tax returns; (4) went to an attorney first, rather than a doctor; and, (5) failed to disclose significant events in his past which would impact upon his current medical condition. These bases for a complete obliteration of plaintiff's credibility are overemphasized and unrelated to the events surrounding the accident, especially when the record is viewed in its entirety.
The record contains additional ample objective and documentary evidence to sufficiently overcome the trial court's lack of credibility findings and to support a reversal.
Dr. Frank Robbins was plaintiff's treating physician who examined Butler two days after the occurrence. Butler had a 50% decreased range of motion in his neck. An x-ray of the cervical area revealed an angulation at the C5-C6 disc level. An angulation, explained Dr. Robbins, is a break in the normal curvature of the vertebrae and is evidence of trauma. It does not occur naturally. Furthermore, the plaintiff's injury was recent. Dr. Robbins opined that Butler could not have worked on the M/V Oyster Bayou with his injury, i.e., a herniated intervertebral disc.
Butler received therapy treatments on April 27, 28 and May 1 and 2, 1989. Dr. Robbins saw Butler on a regular basis through at least January 3, 1990 at which time, he felt, Butler was still unable to work. In August, 1989, Butler continued to complain of pain in his leg. Because of the pain and plaintiff's failure to respond to conservative treatment, Dr. Robbins felt an MRI was essential. An MRI was finally done on August 21, 1990. It revealed what is commonly known as a "slipped disc" which causes a compression of the spinal cord. This compression can cause symptoms in the lower extremities similar to those experienced by Butler.
Dr. Ariel Bar-Sela of the Houston Pain Center corroborated Dr. Robbins's diagnosis of a C-6 radiculopathy caused by a disc injury.
Moreover, Dr. Robbins examined x-rays of Butler's cervical area in 1987 taken as a result of an automobile accident and compared them to x-rays taken after this accident. The 1987 x-rays were normal along with a cat scan of the C-5 and C-6 areas. However, there were identifiable differences between the 1987 and 1989 post-accident x-rays.
Dr. Robbins concluded that based on Butler's history and having examined him two days post-accident, the impact of the power block was the cause of Butler's condition. *1281 He further felt that Butler was not malingering. The clinical examinations, x-rays, and MRI results were all consistent with the trauma described by Butler.
Dr. Dale Bernauer, an orthopedist, who treated Butler for a 1987 cervical injury confirmed Dr. Robbins's analysis of Butler's 1987 injury. The neurological examinations in 1987 were normal, the cervical strain sustained in 1987 was self-limiting in nature, and the CT scans of the cervical areas near C-6 and C-7 were essentially normal. Furthermore, the disc herniation in 1989 at C-5 and C-6 would not be a natural progression from the 1987 injury and would necessarily result from an intervening cause.
Dr. Cecil Clark performed a pre-employment physical examination on Butler on behalf of Zapata on February 23, 1989. No problems were noted. The report indicated a "normal spine." The record lacks any evidence to show an injury between February 23, 1989 and the date of the accident. We have to assume that Butler, therefore, was in good health on April 24, 1989. If, after the incident, Butler had a disabling injury and there is a reasonable possibility that the incident caused the disabling injury, as we so find, then there is a legal presumption that the incident caused the injury. Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977); Heath v. Northgate Mall, Inc., 398 So.2d 132, 134 (La.App. 3d Cir.1981). That legal presumption exists in the case sub judice. The defendant presented no evidence to rebut this legal presumption. The trial judge's failure to recognize and apply this presumption is an error of law.
Dr. William Foster, a neurosurgeon, examined Butler on May 4, 1989, one week after the accident. Butler had "marked paraspinous muscle spasm in the neck." He felt that the spasm was related to the recent injury of Butler. He exhibited a past concussion syndrome, cerebral concussion, and a severe cervical straining injury. Dr. Foster could not completely exclude a herniated cervical disc. He recommended one month of therapy and testified that his findings were consistent with involvement in some type of recent trauma.
At the request of Zapata, Butler was examined on July 23, 1990 by Dr. Gerald Litel, a neurosurgeon. His deposition testimony indicated that Butler's disc herniation occurred between December 16, 1987 and August 21, 1990 and that a blow to the head by a power block can cause a herniated disc. In his report to the attorney for Zapata, Dr. Litel specifically noted the appearance of a cervical strain and "complaints suggestive of a radiculopathy" which is a pinched nerve. Interestingly enough, Dr. Litel's observations mirrored those of Dr. Robbins, plaintiff's treating physician, and Dr. Bar-Sela. Dr. Litel went on to say "I do believe this man sustained a significant blow to his head and has had a post-concussive syndrome."
Zapata's approach and responses to the plaintiff's allegations of injury were not models of consistency. In fact, their justifications and arguments were often disingenuous. Leonard Nunez, for example, testified that he received the first notice of an accident and injury on May 11, 1989 when an attorney for Butler wrote to him. He then assigned Jody Olsen to begin an investigation. Richard Brunner, Zapata's risk manager, testified that statements of potential witnesses and crewmen were taken after Butler spoke with a Zapata official in May, 1989. However, the record is clear that fourteen statements were taken by Ms. Olsen on April 26, 1989, two days after the incident which is the subject of this lawsuit. The testimony of Zapata officials has to be viewed with great suspicion under these circumstances. It borders on the incredulous to assume a position of ignorance with respect to an incident on which an investigation was ordered and conducted two days following the incident and then state that knowledge of the occurrence was first acquired some two weeks after the accident and investigation.
Although it is uncontroverted that Zapata was busy conducting an investigation two days following the accident and was placed on notice of an accident through numerous letters and medical reports received from Butler's attorneys, Zapata asserted in its answers to certain interrogatories on February 1, 1990 that it had no reason to believe Butler was injured, except for his own assertions, *1282 had no knowledge of Butler's injuries, and did not have an accident report. Of course, Zapata's own captain testified that he submitted a report on Butler's accident.
Given the circumstances enumerated above, this court is left with the unmistakable belief that an accident occurred on April 24, 1989 which injured John Butler. The trial court was manifestly erroneous to find otherwise.

NEGLIGENCE OF ZAPATA
Our jurisprudence holds that a seaman such as John Butler has a "featherlight" burden of proof in a civil action, Osorio v. Waterman Steamship Corporation, 557 So.2d 999 (La.App. 4th Cir.), writ denied, 561 So.2d 99 (La.1990), and that the "slightest negligence" is sufficient to sustain Jones Act liability. Reed v. Seacoast Products, Inc., 458 So.2d 971 (La.App. 3d Cir.1984). The record amply establishes that Zapata was negligent in allowing Butler to be struck with a power block being operated by a crewman, Aldoise "Cookie" Hampton, who was inexperienced in the operation of this hydraulically powered equipment. As noted elsewhere in this opinion, Hampton was a cook who was assigned to operate the power block which, according to Captain Mason, was difficult to control.
Because the trial court exonerated Zapata from all liability and this court has imposed liability because of Zapata's negligence, we shall next consider the award of damages after disposing of the issue of the propriety of granting Zapata's motion for involuntary dismissal on the unseaworthiness claim.

UNSEAWORTHINESS
The trial court was correct in dismissing Butler's claim of the unseaworthiness of the M/V Oyster Bayou. We, therefore, affirm.
Article 1672(B) of the Code of Civil Procedure states that:
* * * * * *
(B) In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
The trial court is not required to view the evidence in the light most favorable to the plaintiff. It may weigh and evaluate all the evidence presented up to that point and order a dismissal if the plaintiff has failed to establish his claim by a preponderance of the evidence. Shafer v. State of Louisiana, Through DOTD, 590 So.2d 639 (La.App. 3d Cir.1991).
The power block operator, Hampton, testified that the block was operating normally and was not malfunctioning. The fact that Captain Mason testified about the difficulty of controlling it is not synonymous with a malfunction which would make it unseaworthy. There is nothing in the record which suggests that the vessel and its gear and appurtenances were unsafe or unfit for their intended uses, nor is there any indication that a defective power block was the proximate cause of the accident. See, e.g., Reed v. Seacoast Products, Inc., supra.

MAINTENANCE AND CURE
It is well established that:
When a seaman becomes ill or injured while in the service of his ship, the ship owner must pay him maintenance and cure, whether or not the ship owner was at fault or the ship unseaworthy ... this obligation includes paying a subsistence allowance, reimbursing medical expenses actually incurred, and taking all reasonable steps to insure that the seaman receives proper care and treatment. (Citation omitted).
Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery. (Citation omitted).

*1283 A ship owner who arbitrarily and capriciously denies maintenance and cure to an injured seaman is liable to him for punitive damages and attorney's fees. (Citation omitted).
Porche v. Maritime Overseas Corporation, 550 So.2d 278, 280 (La.App. 4th Cir.1989).
We have previously determined that an accident occurred and Zapata Haynie Corporation was negligent in causing the accident and resultant injuries. Zapata, therefore, had an obligation to provide maintenance and cure to Butler. Maintenance and cure extends to the time an injured seaman reaches maximum medical recovery. Maximum medical recovery
... is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition ... Thus, where it appears that the seaman's condition is incurable, or that future medical treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved.
Pelotto v. L & N Towing Company, 604 F.2d 396, 400 (5th Cir.1979). (Emphasis in original). Reed v. Seacoast Products, Inc., supra at 978.
The plaintiff's exhibit on medical bills in the record reflects total medical bills through trial of $2,390.00. Plaintiff, John Butler, is entitled to recover this amount from Zapata, his former employer.
The record is unclear on when the plaintiff will reach maximum medical recovery. Dr. Robbins testified that Butler will need disc surgery. This procedure has not been accomplished so it is impossible to predict when maximum medical recovery will be reached. Nonetheless, "ambiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman." Porche v. Maritime Overseas Corporation, supra at 280. Zapata paid maintenance benefits to Butler beginning in December 1990 after the medical depositions were taken at the rate of $15.00 per day from December 3, 1990 to December 23, 1990. The benefits were terminated after this date. Dr. Charles Bettinger, the economist employed by the plaintiff, testified that $25.00 per day for room and board was a reasonable estimation for maintenance. This evidence went unrebutted. The plaintiff, therefore, is entitled to the sum of $25.00 per day for maintenance from the date of the accident, April 24, 1989, until he reaches maximum medical recovery. Zapata is to be given credit for the maintenance it paid in the sum of $315.00.

PUNITIVE DAMAGES AND ATTORNEY FEES
The court is aware of Gray v. Texaco, Inc., 610 So.2d 1090 (La.App. 3d Cir. 1992), writ denied, 616 So.2d 686 (La.1993) in which a different panel of this court held that punitive damages were not available on a maintenance and cure claim following Miles v. Apex Marine Corporation, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). This panel respectfully disagrees with Gray v. Texaco to the extent it declined to award punitive damages on a maintenance and cure claim.
Miles v. Apex dealt with non-compensatory damages to an injured claimant. Punitive damages are also non-compensatory but serve a completely different purpose. As opposed to making a claimant whole, punitive damages are meant to penalize a recalcitrant employer for its egregious conduct and deter that employer from future illicit behavior. Its purposes, therefore, are wholly different from the non-compensatory damages to which Miles v. Apex referred. While we respect the position of our colleagues in Gray v. Texaco, we think the better position is that which is taken in Ortega v. Oceantrawl, Inc., 822 F.Supp. 621 (D.Alaska 1992); Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4th Cir.1992), writ denied, 613 So.2d 996 (La. 1993); Thurman v. Patton-Tully Transportation Company, 619 So.2d 879 (La.App. 3d Cir.1993); Duplantis v. Texaco, Inc., 771 F.Supp. 787 (E.D.La.1991); Reed v. Seacoast Products, Inc., supra. Punitive damages are available under a Jones Act claim for negligence and a claim for the arbitrary denial of maintenance and cure to an injured seaman.
*1284 When is a defendant's conduct willful, arbitrary, and capricious so that punitive damages may be awarded? Punitive damages are merited for: 1) laxness in investigating a claim that would have been found to have merit; 2) failure to reinstate benefits after diagnosis of an ailment previously not determined medically; 3) reckless indifference; and, 4) willful, wanton, persistent, callous, or recalcitrant conduct. Reed v. Seacoast Products, Inc., supra; Porche v. Maritime Overseas Corporation, supra; Holmes v. J. Ray McDermott & Company, Inc., 734 F.2d 1110 (5th Cir.1984).
While we find Zapata's conduct to be repugnant and reprehensible in many instances, the record overall reflects Zapata's arguably reasonable, albeit incorrect, belief that an injury-causing accident had not occurred. Its erroneous evaluation of the factual circumstances does not elevate its conduct to the wantonness, recklessness, laxness, or callousness which would merit the imposition of punitive damages and attorney fees. We, therefore, decline to award these damages.

QUANTUM
Butler was examined by several physicians whose cumulative opinions indicate a herniation at the C-5 and C-6 cervical areas. Since he is of limited financial resources and because Zapata refused to pay for the medical expenses, he has been unable to receive extended medical care. Dr. Robbins unequivocally testified that disc surgery is necessary. This court will now proceed to consider various items of damages in its assessment.

A. Special Damages
Dr. Robbins testified that the cost of hospitalization for disc surgery will approximate $10,000.00 to $12,000.00 along with a surgical fee of $4,000.00 to $5,000.00. The court will, therefore, award $17,000.00 for future medical expenses.
Based on a future work expectancy of 11.7 years, Dr. Charles Bettinger, plaintiff's economist, tabulated Butler's loss of future earning capacity at $217,008.00 discounted to present value. Butler's loss of past earning capacity was tabulated at $39,460.00. His total past and present loss of earning capacity is, therefore, $256,468.00 based on 11.7 years of work expectancy with earnings tabulated at $13,000.00 per year as a fisherman for six months and $6.25 per hour for the remainder of that year.[1] Added to this figure is a minimum wage benefit package calculated at 15% or $38,202.00. His loss of past and future earning capacity totals $294,670.00. Dr. Bettinger's calculations are further supported by Dr. Robbins's testimony that the prognosis for Butler returning to any kind of manual labor is poor.
The court has considered Dr. Bettinger's calculation of $25.00 per day for room and board from the date of the accident to the date of trial and the future loss of room and board. However, we decline to award this amount as it has already been awarded as a maintenance benefit and since it is impossible to determine when Butler will achieve maximum recovery.
Furthermore, past medical bills of $2,390.00 will not be awarded as this amount has already been awarded in cure. Because cure is plaintiff's recovery of medical expenses, this amount will not be awarded as past medical expenses. To do so would amount to double recovery. See, Reed v. Seacoast Products, Inc., supra.

B. General Damages
Butler testified that since the accident, he has had to undergo the embarrassment of receiving state welfare assistance to support his family. It is impossible, he testified, to perform some of the odd jobs he was accustomed to performing such as painting his house, picking up the garbage, or even cutting his yard. Moreover, he cannot attend social functions such as french dances with his wife. He cannot afford medical *1285 treatment. He is unable to have the surgery performed as recommended by Dr. Robbins and is unable to see Dr. Moore, a neurosurgeon, as he wishes because of his financial inability. As previously noted, Dr. Robbins testified that the prognosis of Butler returning to any kind of manual labor is poor.
Considering all of these factors, we award Butler $100,000.00 for past pain and suffering and $150,000.00 for future pain and suffering for a total of $250,000.00 in general damages.

 SUMMARY OF DAMAGES
Maintenance - $25.00 per day from the date of the accident
 to plaintiff's maximum medical recovery.
Cure ................................... $ 2,390.00
Future Medical Expenses................. $ 17,000.00
Loss of past and future earning capacity $294,670.00
Past pain and suffering................. $100,000.00
Future pain and suffering............... $150,000.00
 ___________
TOTAL (Excluding Maintenance) $564,060.00

Pre-judgment interest is awarded on all items of damages except future non-economic general damage of $150,000.00. McFarland v. Justiss Oil Co., 526 So.2d 1206 (La.App. 3d Cir.1988); Gray v. Texaco, Inc., supra.

CONCLUSION
For the reasons given above, the judgment of the trial court is affirmed with respect to its dismissal of the plaintiff's unseaworthiness claim, but reversed with respect to its dismissal of plaintiff's Jones Act claim of negligence.
Judgment is hereby rendered awarding maintenance at the rate of $25.00 per day from the date of the accident, April 24, 1989, until plaintiff reaches the point of maximum medical benefit. Additionally, judgment is awarded to plaintiff in the following amounts: cure$2,390.00; future medical expenses $17,000.00; loss of past and future earning capacity$294,670.00; past pain and suffering $100,000.00; future pain and suffering$150,000.00.
Legal interest is awarded on $150,000.00 from the date of this judgment and on $414,060.00 from the date of the accident, April 24, 1989, until paid.
All costs of the trial court and this appeal are assessed against defendant-appellee, Zapata Haynie Corporation.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
STOKER, J., dissents and assigns written reasons.
DOMENGEAUX, C.J., dissents for the written reasons assigned by Stoker, J.
SAUNDERS, J., dissents in part, concurs in part and assigns reasons.
STOKER, Judge,[*] dissenting.
With respect I dissent from the majority's reversal of the trial court's judgment. I dissent on the ground that the trial court's findings of fact that no accident happened were reasonably supported. This is particularly so because his credibility evaluation of the witnesses was quite reasonably based, if not eminently correct.

STANDARD OF APPELLATE REVIEW
The majority opinion in this case is a clear manifesto by the majority setting forth its intention not to be governed by the manifest error-clearly wrong standard for appellate review established by the Louisiana Supreme Court. It is a patent challenge to the authority of the supreme court to jurisprudentially establish the rule. Without the jurisprudentially established rule limiting the constitutional authority of the courts of appeal of Louisiana to review facts as well as law, the appellate courts would apparently have wide open authority to assess anew the evidence and testimony in trial records and cavalierly make their own findings of fact regardless of the findings of fact made by the trier of fact. See footnote two in Rosell v. ESCO, 549 So.2d 840 (La.1989).
However, in the jurisprudentially developed rule the Louisiana Supreme Court has made it quite clear that the constitutional grant does not extend to the point of granting courts of appeal authority to reconsider the facts on a de novo basis. In Rosell the *1286 supreme court stated: "[i]n applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo." Rosell, 549 So.2d at 844. (Citations and footnote omitted.)
Deciding factual issues de novo is exactly what the majority has done in this case, and in so doing it defies the supreme court's clear injunction not to do so.
The Louisiana Supreme Court has addressed itself before and after Rosell to the policy reasons for the rule and to setting forth interpretations in order that appellate courts may properly apply the rule. The majority itself cites Stobart v. State Through DOTD, 617 So.2d 880 (La.1993) as a recent restatement of the rule. In both Rosell and Stobart the supreme court found appellate courts erroneously reversed trial court findings and judgments because they assigned factual rather than legal grounds for reversal. Rosell, 549 So.2d at 843 and Stobart, 617 So.2d at 881. Assigning factual rather than legal grounds for reversing the trial judge's findings of fact and judgment is exactly what the majority has done in this case.
The question here is not whether the majority's view of the facts (including its view on the credibility issue) is more probable or more correct than that of the trial judge. The question is whether the trial judge's view of the facts is reasonably based. In that connection the Louisiana Supreme Court has said that when findings of fact are based on credibility evaluations, such findings of fact can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 845. Moreover, the supreme court has also said that the manifest error-clearly wrong rule is not based merely on the circumstance that the trier of fact hears the testimony and views the evidence personally. It is also based on an allocation of functions between trial and appellate courts. Canter v. Koehring Co., 283 So.2d 716 (La.1973). That in part is the basis for the supreme court's injunction that appellate courts shall not substitute their opinions as to what they consider the facts to be for those of triers of fact even if the appellate court would have decided the case differently had it heard the case initially as the trier of fact.
In referring to Stobart the majority quotes from the opinion to some extent, but (without so indicating) omits highly significant language. After quoting the supreme court's injunction that appellate courts must review the record in its entirety and not merely examine the record to see if there is some evidence to support the findings of the trier of fact, the following statement (omitted by the majority opinion) appears:
"Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." Stobart, 617 So.2d at 882. (Citations omitted.)
Moreover, in quoting from Stobart, the majority stops short of quoting the following significant language:
"Nonetheless, this Court has emphasized that `the reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."' (Citations omitted.)"
"This court has recognized that `[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.' Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id." Stobart, 617 So.2d at 882-883. (Emphasis added.)
In Rosell, regarding the deference to be accorded credibility evaluations by a trier of fact, the supreme court said:
"When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard *1287 demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. (Citations omitted.) Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. (Citations omitted.) But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. (Citations omitted.) Rosell, 549 So.2d at 844-845.
In an attempt to water down and lessen the binding effect of the manifest error-clearly wrong standard of review set forth in Rosell and Stobart, the majority makes reference to the Louisiana Supreme Court case of Mart v. Hill, 505 So.2d 1120 (La.1987) through a quotation from Dugas v. Fontenot Motors, Inc., 510 So.2d 1374 (La.App. 3d Cir.1987). Both cases predate the decisions in Rosell and Stobart. However, chronology is not the factor which distinguishes the cases. Even before Mart v. Hill, the manifest error-clearly wrong rule was embodied in Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978) which was a reinterpretation of Canter v. Koehring Co., supra. See Rosell, 549 So.2d at 844.
The majority states in its opinion that certain principles set forth in Mart, as paraphrased in this court's Dugas case, should be balanced against the directions set forth in Rosell and Stobart. Dugas paraphrases from Mart as follows:
"The principles of appellate review do not require an appellate court to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles. Mart v. Hill, 505 So.2d 1120 (La.1987)."
Dugas, 510 So.2d at 1376.
The majority's reliance on the quoted statement virtually accuses the supreme court of not meaning what it says and of sending mixed and confusing signals. Mart v. Hill is not intended as a license to disregard the manifest error-clearly wrong standard anytime an appellate majority wishes to do so. Both Mart and Dugas must be read in context. As the quotation set forth above shows, the supreme court's pronouncement in Mart was directed toward a "trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony." Mart, 505 So.2d at 1127. (Emphasis added.) The case before us is not a case involving uncontradicted testimony. The diametrically opposed testimony in this case required that the trial judge make a credibility evaluation as to whether or not an accident actually happened. Also, there is no "greatly preponderant" objective evidence which corroborates plaintiff's claim that he sustained an injury-producing blow to his headother than the medical testimony, and, as the trial judge observed, the medical testimony is questionable on this point.
In Mart v. Hill, the supreme court was presented with a case in which the facts were relatively clear. An accident happened. The concern of the supreme court involved the correctness of the lower courts' allocation of fault between the plaintiff and the defendant (a highly subjective matter) and the length of plaintiff's disability and consequent medical expenses beyond a certain date. The latter issue simply involved the supreme court's different interpretation of the medical evidence about which there was no dispute. I submit, therefore, that the statement in Mart relied upon by the majority must be read in context. It has no application to disputed facts. Mart is distinguishable from the case before us.
What I have stated above about Mart also applies to Dugas v. Fontenot Motors, Inc.. Dugas was a worker's compensation case in which the occurrence of an injury-producing *1288 accident on the job depended on the plaintiff's sole testimony. However, there was no testimony or evidence which contradicted the plaintiff's word. The court of appeal found corroboration for plaintiff's claim that he had an accident, and the court of appeal reversed the trial court's dismissal of plaintiff's suit after plaintiff rested his case. The case was remanded for further proceedings.
I respectfully submit that the majority's reliance on Mart and Dugas is entirely misplaced. The pronouncements in those cases are based on situations quite distinct from the situation before us. The situation before us is analogous to the situations in Rosell and Stobart. In Mart and Dugas the given facts were undisputed. In Rosell and Stobart the appellate courts simply made determinations of factual issues different from those of the triers of fact, that is, they made de novo determinations. That is what is proscribed by the manifest error-clearly wrong rule.
I further submit, respectfully, that if the majority's utilization of Mart and Dugas should be allowed to stand, then Rosell and Stobart would have no meaning. When it might please an appellate court majority, it could invoke Mart to cancel out Rosell and Stobart. The Louisiana Supreme Court laid down both sets of principles. Obviously, both must have validity and do not cross one another out. Thus, the principles apply to differing situations. They are not in conflict.
After reviewing the record in this case, and applying the principles discussed above, I find no basis for concluding that the trial judge's findings of fact are not reasonably based. Particularly, the trial judge's evaluation of the credibility of the witnesses is well supported in the record. This is especially so in view of the fact that the plaintiff's co-worker witnesses claimed that earlier statements made by them denying that an accident occurred were not true but were based on protecting an entitlement to bonuses based on the absence of injury-producing accidents during the fishing run. Consequently, I dissent from the majority's reversal of the trial court. The trial judge's rejection of the plaintiff's claim should not be reversed. In support of my views I think it is appropriate at this point that I set forth in full the written reasons for judgment of the trier of fact, the Honorable H. Ward Fontenot, the district judge who heard and decided the case in a bench trial.

TRIAL JUDGE'S REASONS FOR JUDGMENT
The following are Judge Fontenot's reasons:
"The plaintiff, John William Butler, claims that he suffered an injury on April 24, 1989 while working as a seaman on a vessel owned by the defendant, Zapata Haynie. He claims a residual physical disability as a result of the injury.
"What is certain is that on April 24, 1989, plaintiff was a member of the crew of the vessel, M/V Oyster Bayou. The vessel was engaged in catching menhaden, a fish widely referred to as a `pogy', in the Gulf of Mexico. The incident alleged by the plaintiff occurred on a `purse boat.' This is a powered launch carried by the main vessel, called the `steamer.' A steamer uses two purse boats in the fishing operation.
"The purse boats are used to draw out a large net and to encircle the schools of menhaden. Each purse boat has a power block mounted on a swivel boom. The block is used to reel in the net. The power block can be moved vertically and horizontally by an operator in the bow of the purse boat. Plaintiff's testimony was that the swinging of the boom resulted in a blow to his head which caused his disabling injury. Defendants dispute that any such incident took place.
"The bulk of the evidence in this trial turned on the events subsequent to April 24, 1989 but the first inquiry of the court must be whether or not the plaintiff can sustain his burden regarding the occurrence of an accident on April 24, 1989.
"The seaman is said to have a `featherlight' burden in a civil action. But though his burden requires a showing of only the slightest negligence, he must still prove the accident and its causitive [sic] link with an injury. Osorio v. Waterman S.S. Corp., 557 So.2d 999 (La.App. 4th Cir.1990). Miller v. Lykes Brothers-Ripple SS Co. Inc., 98 F.2d *1289 185 (5th Cir.1938). An analysis of the facts follows.
"Plaintiff's version of events rest [sic] solely upon his testimony and that of two other crew members of the M/V Oyster Bayou, namely Oscar Dudley and George LeMelle. It was Butler's testimony that while doing his work in the purse boat as a cork puller, the power block was swung by the operator and struck him in the head. The impact broke the hard hat which he wore and knocked him unconscious. He then awoke in the hole of the ship where he was receiving medical attention. His injuries were disabling and he never returned to work as a fisherman because of the accident.
"Plaintiff's first witness on this issue was Oscar Dudley who testified that he remembered Butler being hit and being knocked unconscious. He further testified that the crew had to stop work when Butler got hit so that the injured seaman could be carried below deck.
"George LeMelle was compelled to testify by the court. He had also been a member of the crew and he testified in open court to substantially the same facts given by Dudley. He remembered the plaintiff receiving a serious blow to the head and the work stoppage that followed.
"The versions recited above are directly contradicted by Bruce Mason, who was the captain on the M/V Oyster Bayou on April 24, 1989 and by Aldoise Hampton, the operator of the power block on the purse boat the day of the alleged incident.
"It was Captain Mason's testimony that, from his vantage point in the other purse boat, he witnessed the power block coming into contact with the edge of plaintiff's helmet but that there was no blow. He testified that the hat was not knocked off and the plaintiff was unaffected by it. He went on to testify that after the crew had returned to the steamer, he was told that plaintiff was ill below deck. Upon the captain's inquiry, the plaintiff told him that his head hurt and he had gas on his stomach and gas on his arm. It is important to note that the plaintiff did not connect this condition to any incident on the purse boat or to any accident. The plaintiff's ailments were treated with an antacid and aspirin.
"It was the captain's further testimony that upon reaching shore, Butler and the captain exchanged angry words about the performance of the crew. The conversation ended with plaintiff's quitting as a member of the crew. Later that evening, Butler returned and asked that an accident report be filed regarding a blow to his hard hat by the power block. Captain Mason initially refused, telling Butler that he was fabricating. Later the captain did file an accident report describing the accident as `minor.'
"Aldoise Hampton was the ring setter on the purse boat occupied by the plaintiff. In his job duties, he occasionally was called upon to operate the power block and was doing so at the time that plaintiff alleges his accident. It was Hampton's testimony that he did not see anyone get hit and no one was carried off of the purse boat. On cross examination, he admitted that from his position in the purse boat, some things could occur which would escape his attention but he testified that he would have noticed any interruption in the work and denied that any such interruption took place.
"Faced with such contradictory testimony, the court has had the task of deciding whether the testimony in support of plaintiff's position is sufficiently trustworthy.
"A review of the plaintiff's testimony, both in open court and through his earlier depositions, discloses him to be evasive and purposely vague. He admitted making false statements in his job application with the defendant herein relating to previous loss time accidents. He intentionally failed to mention an automobile accident, one he could hardly forget because he filed a lawsuit in connection therewith.
"Plaintiff does not file income tax returns. When questioned about his previous employment, both at trial and earlier, major discrepancies in his testimony are irreconciliable [sic] and too glaring to be inadvertent.
"He admitted in court that upon returning home after leaving the boat, he did not first go to a doctor for his injury but instead went to an attorney. When questioned about that *1290 suspicious development, he testified that he thought he was going to a doctor's office.
"The plaintiff's credibility is further eroded when the testimony of the various doctors is analyzed. Each time a history was given to a physician, it failed to adequately disclose the significant events in plaintiff's past which would bear upon his current medical condition.
"The testimony of Oscar Dudley and Philip LeMelle also does not bear close scrutiny. Both of these witnesses gave statements on April 26, 1989, two days after the alleged incident, in which they gave versions of the incident which agreed with the testimony of Captain Mason and Hampton and refuted that of the plaintiff. The explanations given by both of these witnesses at trial for recanting their statements was the same: that a bonus was paid to boats for not having accidents and that they had lied in order to protect the bonus.
"This proffered justification for giving false testimony whenever convenient does not explain why LeMelle affirmed his initial statement with another statement as late as January of 1991, long after his incentive bonus was history.
"In Dudley's case he admitted that he was related by marriage to the plaintiff, was a close acquaintance and was accompanying the plaintiff back and forth to the courthouse each day. Furthermore, Dudley gave testimony about his own earnings as a fisherman which was found to be absolutely false.
"In summary, plaintiff's case must rest on his credibility and that of Dudley and LeMelle. The court concludes that their credibility is nonexistent. On the other hand, the testimony of Captain Mason and of Aldoise Hampton, neither of whom is still employed by Zapata Haynie, was not impeached and there was no effort to do so.
"In view of the above, it is the finding of the court that the plaintif [sic] has failed to prove the occurrence of an injury-causing accident while he was aboard defendant's vessel on April 24, 1989. Considering the above and foregoing, the plaintiff's petition is dismissed at his costs. The fees of the experts will be fixed by the court at the time that a formal judgment is presented reflecting these views which judgment will be signed upon presentation."
Upon careful review of the record, I can see no basis for disturbing the trial judge's resolution of the conflict in the testimony and his finding of fact that plaintiff "failed to prove the occurrence of an injury-causing accident while he was aboard defendant's vessel on April 24, 1989."
Judged against the record, the trial judge's conclusions are certainly reasonable. Reasonableness is the touchstone for determining whether an appellate court may disregard the conclusions of a trier of fact as to what the true facts may be.
In order to negate the testimony of Capt. Mason, counsel for plaintiff sought at trial to establish that there were two incidents in which the power block struck the plaintiff, that Capt. Mason saw only one of the events and he did not see the event which plaintiff claims resulted in an injury-producing accident. The record does not establish that there were two such events, but the majority opinion seizes upon the suggestion and innuendo that there were two events. The majority opinion appears to rest its discounting of Capt. Mason's testimony on the two-event theory. However, the majority never points to any proof in the record that there were two such events.
My reading of Capt. Mason's testimony on pages 268 through 274 of the record indicates that he was present on his boat next to the mate boat during the entire time in which plaintiff allegedly experienced an injury-producing accident. Mason testified he saw plaintiff's hat get bumped but that plaintiff continued to work and finished the set. There was no interruption in the process in which the workers were engaged. To the contrary, plaintiff's witness, Oscar Dudley, testified (R. 505 and 506) that plaintiff was so injured by the blow to his head that it knocked his helmet off, knocked plaintiff so that "he just went that way" and "[w]e had to stop and went and try [sic] to get him on the big boat." Further, he said "the cook and them helped him down in the hold."
*1291 It would seem quite clear that if plaintiff Butler had been as immediately incapacitated by the blow as Dudley said he was, Capt. Mason could not have failed to notice it. The same observation applies to Aldoise Hampton, the operator of the power block who saw nothing like what Dudley described. When Capt. Mason went to check on Butler in the hold, he saw no evidence of injury (R. 274) despite the fact that Butler told Mason that he, Butler, had been hit in the head by the power block. (R. 273).
It is clear from the record that the two-accident or event theory was fully advanced in the trial court and considered by the trial judge. (See R. 266 and 267.) Because the trial judge accepted the testimony of Mason and Hampton over that of plaintiff and his witnesses, he clearly rejected the suggestion that Butler may have been seriously injured in an accident Mason and Hampton did not see. Based on fair consideration of all of the testimony, this is an entirely reasonable resolution of the conflicting testimony. And, as I have continued to note in this dissent, if that resolution has a reasonable basis, the manifest error-clearly wrong rule requires that this court of appeal find that the trial court was not clearly wrong. The majority erred in doing so.
I will forego the temptation to pick the record to demonstrate the inconsistencies in the testimony of plaintiff's witnesses, nor will I dwell upon their claim that they gave false statements early on in order to obtain the bonus given for an accident-free expedition. The trial judge adequately covered these points. The trial judge also gave a reasonable explanation as to why he gave no probative weight to the medical testimony insofar as it purported to establish that plaintiff was injured in an accident on defendant's boat.

PLAINTIFF'S BURDEN OF PROOF
I digress at this point to briefly address plaintiff's contention that his burden of proof in this case is "featherlight" under federal maritime law. The trial court made brief reference to this contention in his reasons for judgment, but I add these observations to reinforce the total inapplicability of the "featherlight" burden of proof. Under federal jurisprudence, evidence of "the slightest negligence" is sufficient to sustain a finding under the Jones Act. Osorio v. Waterman S.S. Corp., 557 So.2d 999 (La.App. 4th Cir.), writs denied, 561 So.2d 99 (La.1990); Reed v. Seacoast Products, Inc., 458 So.2d 971 (La. App. 3d Cir.1984). However, as the words "slightest negligence" imply, the concept applies to circumstances in which an injury-producing accident actually took place, and the question is whether that accident occurred because of negligence. In such cases maritime law tips the scales in favor of a seaman by requiring that the seaman establish only the "slightest negligence." Thus, proving that an injury-producing accident actually occurred is a necessary predicate to using the "slightest negligence" rule to establish that the accident resulted from negligence.
In the case before us, we should not reach the slightest negligence rule since the trial judge was not manifestly erroneous or clearly wrong in finding that an injury-producing accident did not in fact occur. Because there is no manifest or clear error in that finding, there is no reason to be concerned with the slightest negligence rule, and we should go no further and should affirm the trial court's findings.

FEDERAL AND STATE STANDARDS OF APPELLATE REVIEW OF FACTS
In briefing this case for this court, counsel have made references to the "clearly erroneous" standard of review set forth in Federal Rule of Civil Procedure 52(a). In my opinion reference to the federal standard for appellate review of factual issues is not necessary for several reasons. To begin with, the federal standard does not apply in a state proceeding to appellate review of factual determinations of a trial court. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 712, 106 S.Ct. 1527, 1529, 89 L.Ed.2d 739 (1986). Based on Icicle Seafoods, Inc., the Louisiana Supreme Court, in a per curiam opinion stated that "the procedural law of Louisiana controls as to the scope of appellate review." Daigle v. Coastal Marine, Inc., 488 So.2d 679, 682 (La.1986). This Louisiana Supreme *1292 Court statement may be dicta. However, this court of appeal followed the pronouncement in Icicle Seafoods, Inc., and Daigle and quoted from the former to hold that "the U.S. Supreme Court stated [in Icicle Seafoods, Inc.] that `state courts are not required to apply Rule 52(a)a rule of federal civil procedureto their own appellate system for reviewing factual determinations of trial courts.'" Hanks v. Barge Transport Co., Inc., 563 So.2d 1297, 1300 (La.App. 3d Cir.), writ denied, 569 So.2d 964 (La.1990).
Finally, it would appear that the federal standard for appellate review of factual determinations is virtually identical with the Louisiana standard of Rosell and Stobart. In a per curiam opinion by Judges Politz, King and Smith of the U.S. Court of Appeals for the Fifth Circuit, the court used language which is almost a quotation from Rosell. Schexnider v. McDermott International, Inc., 868 F.2d 717, 720 (5th Cir.1989).[1]
Despite the holdings on this issue referred to above, the matter appears to be in some confusion in the courts of appeal in Louisiana. The Court of Appeal, Fifth Circuit, State of Louisiana, recently applied the state standard of Rosell in a Jones Act and general maritime suit. Hae Woo Youn v. Maritime Overseas Corp., 605 So.2d 187 (La.App. 5th Cir.1992).[2] After pointing out how emphatically the Louisiana Supreme Court had expressed itself in Rosell and subsequent cases, the fifth circuit then made reference to that circuit's earlier case of Sutton v. Central Gulf Lines, Inc., 433 So.2d 888 (La.App. 5th Cir. 1983). In referring to Sutton, the fifth circuit appears to equate the federal rule to the Louisiana rule of Rosell; that is, the fifth circuit apparently felt that the rules are the same, or at least similar. With that I agree.
In Sutton, in discussing the applicable standard of review, the fifth circuit in 1983 appears to have felt it was bound by the federal rule as embodied in Federal Rule of Procedure, Rule 52(a). The fifth circuit set forth the pertinent portion of that rule in a footnote as follows:
"1. Fed.R.Civ.P. 52(a) provides, in pertinent part, as follows:
`(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' (Emphasis added)"
433 So.2d at 891 n. 1.
Under the case of Hae Woo Youn, the fifth circuit appears to hold that the clearly erroneous Rule of 52(a) is the same as the Louisiana manifestly erroneous-clearly wrong rule of Rosell and Stobart discussed earlier in this opinion.
Interestingly, the Louisiana Court of Appeal, Fourth Circuit, has taken contrary views within that circuit as to whether federal or state law governs the standard for *1293 appellate review of facts. Young v. Armadores de Cabotaje, S.A., 617 So.2d 517 (La. App. 4th Cir.), writs denied, 625 So.2d 170 and 171 (La.1993); Forrest v. Waterman Steamship Corp., 617 So.2d 59 (La.App. 4th Cir.), writ denied, 619 So.2d 544 (La.1993); Osorio v. Waterman S.S. Corp., supra.
Forrest is a case much like the case before us. In Forrest the crucial issue was whether the plaintiff proved that his injury occurred on board one of the defendant's barges, and the issue turned on the credibility of the plaintiff. The Louisiana Court of Appeal, Fourth Circuit, ruled as follows:
"Because plaintiff's claim is brought under the general maritime law of the United States, our standard of review in this case must correspond to that of a federal appellate court. Guilbeau v. Calzada, 240 So.2d 104 (La.App. 4th Cir.1970). Under federal law, the findings of the trial judge may not be disturbed on appeal unless they are clearly erroneous, and further, due regard shall be given to the opportunity of the trial judge to judge the credibility of witnesses. Fed.Rule Civ.Pro. 52(a); Sutton v. Central Gulf Lines, Inc., 433 So.2d 888 (La.App. 5th Cir.1983).
"In our view, the instant case turns on the credibility of the plaintiff because he is the only one who knows how the accident occurred. According to his Reasons for Judgment, the trial judge determined, based on the inconsistencies in the plaintiff's testimony and the evidence tending to discredit his story, that the plaintiff was not believable. He therefore concluded that the plaintiff had failed to prove by a preponderance of the evidence that his injury occurred aboard one of the LASH barges. We do not find this conclusion to be clearly erroneous in light of the total evidence presented, especially giving due deference to the trial judge as the judge of credibility.
"Accordingly, for the reasons stated, we affirm the judgment of the trial court."
Forrest, 617 So.2d at 61.
Thus, despite applying the federal standard, the court of appeal affirmed a judgment for the plaintiff.
In Osorio the fourth circuit considered it should review a Jones Act claim under the federal standards of review, although it noted that in Daigle v. Coastal Marine, Inc., supra, the Louisiana Supreme Court had questioned the correctness of applying federal standards to any type of maritime case filed in state court. In Young, 617 So.2d at 525, the fourth circuit held that in maritime cases the state standard of appellate review applied, as follows:
"LIABILITY OF ARCASA"
"ARCASA's primary assignment of error is that the evidence was insufficient to support a finding that it was negligent and that such negligence was a cause of plaintiff's injuries.
"We first address the applicable standard of appellate review. Federal jurisdiction over 33 U.S.C.A. § 905(b) claims is based upon the general maritime law. 28 U.S.C.A. § 1333(a); Russell v. Atlantic & Gulf Stevedores, 625 F.2d 71 (5th Cir. 1980). State courts have concurrent jurisdiction with federal courts to hear LHWCA cases by virtue of the `saving to suitors' clause of 28 U.S.C.A. § 1333(1); Bynum v. Patterson Truck Lines, Inc., 655 F.2d 643 (5th Cir.1981); Allen v. Keeney, 442 So.2d 1171 (La.App. 1st Cir.1983), writ denied, 445 So.2d 1232 (La.1984). State courts apply their own system for reviewing factual determinations of juries in general maritime law and LHWCA cases. Simmons v. Hope Contractors, Inc., 517 So.2d 333 (La.App. 1st Cir.1987), writ denied, 518 So.2d 510 (La.1988).
"The question of negligence in a maritime case is a question of fact for the jury. Randolph v. Laeisz, 896 F.2d 964 (5th Cir.1990). Louisiana appellate jurisdiction extends to review of questions of law and fact in civil cases. La. Const. art. 5, §§ 5 and 10. On appellate review, a court may not disturb the factual findings of a judge or jury unless those findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, Co., 283 So.2d 716 (La.1973)."

*1294 PLAINTIFF'S CONTENTIONS REGARDING TRIAL COURT'S CREDIBILITY DETERMINATION
In a reply brief filed on behalf of plaintiff we are urged to consider that Rosell itself does not completely foreclose an appellate court of this state from reversing a trier of fact on a finding of fact. Counsel cites the case of Elliott v. U.S. Fidelity & Guar. Co., 568 So.2d 155 (La.App. 2d Cir.1990). This position is much the same as that set forth by the majority opinion in this case in which the majority relies on the cases of Mart v. Hill, supra, and Dugas v. Fontenot Motors, Inc., supra. My reply to this contention of plaintiff is the same as that addressed to Mart and Dugas. However as Elliott is readily distinguishable, I will address plaintiff's contention in this regard.
In Elliott the court of appeal reversed a trial court's finding of fact and a judgment in favor of a plaintiff in a personal injury suit. The court of appeal squared its decision to reverse in the following comments:
"While we recognize that the trial court's factual findings and credibility determinations are due great weight, we are not required to accept its unreasoned and unreasonable conclusions as to either. Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir.1983), writ denied, 443 So.2d 586 (La.1983). In Louisiana, courts of appeal have a duty to fully and completely review not only the law applied by trial courts but also the factual determinations made therein. La. Const. Article 5 § 10; Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). The supreme court has recently reiterated that a reviewing court may overturn a factual finding grounded on a credibility call if the objective evidence so contradicts the witnesses' story or the story itself is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it. However, in the absence of such factors, a finding of fact based on the fact-finder's decision to believe the testimony of one of two or more witnesses can virtually never be clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989); Duncan v. State Department of Transportation and Development, 556 So.2d 881 (La.App. 2d Cir.1990)."
Elliott, at 158-159.
These comments, applicable in Elliott, are not apropos in the case before us. Read in the context of the Elliott case, the statement of the court of appeal was fully justified. As the opinion in Elliott clearly reveals, the trial judge in that case erred in seeking evidence outside the record and acted unreasonably in ignoring the evidence which was properly before him.
The trial judge in the case before us wrote very well grounded reasons for his findings. I submit that his findings are not unreasonable. There is no objective evidence to contradict the facts as found by the trial judge. The finding that there was no injury-producing accident is reasonable. There is no internal inconsistency or implausibility on the face of that finding. All we have in this case is a credibility evaluation of witnesses asserting two diametrically opposed contentions as to whether an accident causing an injury occurred or did not occur. I find no basis for disturbing the trial judge's finding of fact. Accordingly, I dissent. I would affirm the trial court's ruling.
SAUNDERS, Judge, concurring in part and dissenting in part.
I have reviewed the entire record in this case and do not find any evidence to support the proposition that the plaintiff, John Butler, was not struck by the boom of the M/V Oyster Bayou. Accordingly, I agree with the author of the majority opinion that we must reverse the trial court's finding that no accident occurred inasmuch as the record conclusively shows that there was an accident. The court below, having found that no accident occurred, does not address the issues of causal connection, extent of injuries, entitlement to maintenance and cure, entitlement to punitive damages and quantum of damages. With regard to these issues, I agree with the conclusions of the lead author, including the view expressed in the majority opinion that punitive damages may be available in a maintenance and cure claim, although they are not warranted in the present claim.
*1295 I do not agree, however, with the view expressed in the majority opinion with reference to the quantum of loss earning capacity which is assessed at $294,670.00. I concede that had the court below awarded this quantum for loss earning capacity, there is evidence to support such a funding. Reviewing the record as a whole, however, and considering the plaintiff's sporadic work history, his failure to file income tax returns, and his long absence from the seaman's calling, I feel that an award for this item of $150,000.00 would be more appropriate and more in keeping with the evidence of record.
Accordingly, while I agree with the majority in all other respects, I disagree with the award as to quantum of loss earning capacity.
NOTES
[1] Aldoise Hampton testified that, on the average, a fisherman would earn $13,000.00 for a six month fishing season. Butler testified that he would earn $6.25 per hour "fairly regularly" working as a house painter, and Charles Stevens, for whom Butler worked as a handyman for twelve to thirteen years, stated that Butler would earn $100.00 per day when he worked. Since the accident, he could no longer perform those duties for Stevens.
[*] Retired Judge Jimmy M. Stoker participated in this case prior to his retirement from the Court of Appeal, Third Circuit, State of Louisiana. He continued to participate in the case after his retirement through assignment as a judge ad hoc by the Louisiana Supreme Court.
[1] In Schexnider v. McDermott International, Inc., 868 F.2d 717, 720 (5th Cir.1989), the U.S. Court of Appeals for the Fifth Circuit stated:

"Determinations as to the credibility of witnesses are peculiarly within the province of the district court. Even if we were convinced, which we are not, that had we been sitting as the trier of fact, we would have weighed the evidence differently, our ability to reverse the district court's judgment on the basis that its findings of fact are clearly erroneous is extremely limited. As the Supreme Court said in Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), `when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.' Id., 470 U.S. at 575, 105 S.Ct. at 1513."
[2] In Hae Woo Youn v. Maritime Overseas Corp. the Louisiana Supreme Court denied a writ in 609 So.2d 240 (La.1992), granted a writ in 609 So.2d 239 (La.1992), and in an opinion at 623 So.2d 1257 (La.1993) modified the court of appeal in part to reinstate the damages awarded by the trial court. See also cert. denied, ___ U.S. ___, 113 S.Ct. 1342, 124 L.Ed.2d 252 (1993).